**UNITED STATES v. SAGLIETTO et al.**
**Criminal No. 8344.**

District Court, E. D. Virginia, at Norfolk.
Sept. 10, 1941.

Sterling Hutcheson, U. S. Dist. Atty., and Russell T. Bradford, Asst. U. S. Atty., both of Norfolk, Va., for the United States.

Homer L. Loomis, of New York City, and Lester S. Parsons, of Norfolk, Va., for defendants.

PAUL, District Judge.

By an indictment returned by a grand jury on May 5, 1941, the defendants were charged with a violation of a statute of the United States which reads as follows: "Whoever shall set fire to any vessel of foreign registry, or any vessel of American registry entitled to engage in commerce with foreign nations, or to any vessel of the United States as defined in section three hundred and ten of the Act of March fourth, nineteen hundred and nine, entitled 'An Act to codify, revise, and amend the penal laws of the United States' [section 501 of this title], or to the cargo of the same, or shall tamper with the motive power or instrumentalities of navigation of such vessel, or shall place bombs or explosives in or upon such vessel, or shall do any other act to or upon such vessel while within the jurisdiction of the United States, or, if such vessel is of American registry, while she is on the high sea, with intent to injure or endanger the safety of the vessel or of her cargo, or of persons on board, whether the injury or danger is so intended to take place within the jurisdiction of the United States, or after the vessel shall have departed therefrom; or whoever shall attempt or conspire to do any such acts with such intent, shall be fined not more than $10,000, or imprisoned not more than twenty years, or both."

The statutory provision above quoted is a portion of an Act of Congress approved June 15, 1917, being Chapter 30 of the Public Laws of the United States passed by the 65th Congress. The act appears in 40 Statutes, page 217, and the particular portion of the act under which the indictment is laid is Section 1 of Title III of the act, 40 Stat. 221. In the United States Code, this particular section has for some reason been set aside from the rest of the statute and appears as 18 U.S.C. A. § 502.

The indictment is in three counts, the first of which charges: "That Paul Stefano Saglietto, Agostino Ratto, and Attilio Maggi, heretofore, to-wit, on or about the 29th day of March, 1941, in Hampton Roads, Virginia, in the Eastern District of Virginia, and within the jurisdiction of this Court, did unlawfully, feloniously, knowingly, and willfully tamper with the motive power of the Steamship San Giuseppe, a vessel of foreign registry, to-wit, of Italian Registry, while said vessel was within the jurisdiction of the United States, with the intent to injure and endanger the safety of said vessel and of persons on board; contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States of America."

The second count is in similar language, except that it charges a tampering with the *instrumentalities of navigation* of the vessel. The third count is a conspiracy count, charging that the defendants conspired among themselves and with other persons unknown to commit the acts which are charged substantively in the first and second counts.

At the time of the acts complained of the defendant Saglietto was the captain of the Italian steamship San Giuseppe, which was then at anchor in the harbor of

Hampton Roads, and the defendants Ratto and Maggi were members of the crew of such vessel. As a result of a trial, a jury, on June 27, 1941, returned a verdict of guilty as to all three defendants on the first and second counts (the substantive offenses), but upon the conspiracy count Saglietto alone was found guilty.

Following the rendition of the verdict, the defendants seasonably submitted their motions in arrest of judgment and to set aside the verdict and grant a new trial. It is my opinion that the motion in arrest of judgment presents no matter appropriate to such a motion that has not already been passed on in considering and overruling a demurrer to the indictment. Other matter embodied in the motion in arrest seems more fitted for consideration in the motion to set aside the verdict. Therefore, it is the latter motion only which needs discussion.

This is one of four companion cases in which indictments were returned against the masters of four Italian vessels (and in two of the cases, including this one, against members of the crew) for similar acts.

The pertinent facts in each of the cases were the same and are in substance as follows:

These vessels, which were under different ownership and sailing separately, all arrived in the harbor of Hampton Roads within a few days of each other and in each case either a few days prior to or a few days after June 10, 1940, the date on which Italy entered the war against Great Britain and France. Prior to sailing from their home ports in Italy, the captains of these ships had been instructed by their respective owners that in case Italy went to war, as then seemed probable, the vessels should be taken to the nearest neutral port and the masters of the vessels should report to and subject themselves to the orders of the highest naval authority of the Italian government in the country whose port had been entered.

It was testified that the merchant marine of Italy is a part of the naval reserve of that country and, upon a declaration of war, Italian merchant vessels and their officers and crews automatically come under the authority of the naval authorities of Italy.

The masters of these vessels accordingly reported their entry into Hampton Roads to the naval attache of the Italian government in Washington, D. C., and were instructed by him to make no attempt to go to sea, but to take anchorage and await further orders. The vessels were assigned anchorage in what is referred to as section G of the harbor, which is apparently used for vessels whose stay in port is expected to be of some length. It is in a rather remote part of the harbor where the water is comparatively shallow and the vessels were anchored from a mile to a mile and a half from any regularly used channel of navigation and approximately the same distance from the nearest pier, dock or other structure along the waterfront at Newport News, the nearest city.

The vessels remained at this anchorage with their crews and captains aboard, with the exception that Captain Saglietto, the defendant here, was directed to take up quarters in a hotel in Norfolk, which he did, leaving the San Giuseppe in command of the first officer. The reason for this was, apparently, that it was desired to have someone ashore who could look after the interests of all these Italian ships in various matters, including libel proceedings in which one or more of them were involved and who, being ashore, would be accessible to telegraph and telephone or to personal interview in connection with any matter touching the activity or welfare of these vessels. That Captain Saglietto should have been directed to assume this duty was no doubt due to the facts that he seems to have been the senior in service among these ship captains, he spoke English fluently, he had been coming to this port for many years and was familiar with the city of Norfolk and its surroundings.

Sometime in February, 1941, while this situation existed and after the vessels had been resting at anchorage for approximately eight months, the naval attache of the Italian government, Admiral Lais, came to Newport News and was entertained aboard the San Giuseppe at a lunch at which the captains of all these ships were present. During the day of this visit and before returning to Washington, the naval attache took occasion for a brief talk with each of the officers in direct command of the respective ships, apart from the others. In each instance the subject of the conversation was the same and was to the effect that it might become advisable that his ship be rendered incapable of navigation;

and that in such case he (the naval attache) would transmit orders to that effect by a telegraphic message which would be sent to Captain Saglietto in Norfolk, who would communicate it to the ship captain. It was explained that the telegram would be what is referred to as a "conventional" message (a code message) and would be in the form of a request for a report on the number of men in his crew; and that upon receipt of such a message the recipient was forthwith to so disable the main engines of his vessel as to render the ship incapable of navigation under its own power. These captains were further instructed that in carrying out this order they were to create no disorder in the port and no injury to surrounding property; that no parts of their vessels except the main engines were to be injured, and that the auxiliary engines were to be left intact and unharmed. It was testified that by the use of these auxiliary or "donkey" engines the vessels could be kept heated for comfort of the crews, the anchors could be lowered and raised, and the pumps operated in case of fire, leakage or other conditions requiring their use. These ship captains testified that when they received their instructions from Admiral Lais, they took them as military orders in the obedience of which they had no choice and as to the purpose of which they were not permitted to inquire. One of them stated, however, that he understood or assumed that it was feared that in some manner the ships might come into possession of Great Britain and be used against the interests of Italy.

On March 19, 1941, Captain Saglietto, in Norfolk, received a telegram requesting a report on the number of the crews on two of the vessels in the harbor (the Giuan and the Laconia) and on March 28, 1941, a similar telegram as to the remaining vessels including the San Giuseppe. In each instance he transmitted the contents of the messages by telephone to the officers in command of the ships at Newport News. As to his own ship, the San Giuseppe, he transmitted the message to his first officer, who was in direct command, and also to the chief engineer of the vessel.

On March 29, 1941, officers of the U. S. Coast Guard, evidently acting on rumors or reports that had reached them, boarded all of these Italian vessels and found that on all of them the main engines had been completely put out of commission by removal or destruction of their vital parts. The captains of the respective vessels were questioned as to the damage found and the nature of the statements made by Captain Saglietto furnishes the only real conflict of evidence in this case. According to the government officers who interviewed Captain Saglietto, he stated that the damage aboard his ship had been done on his instructions given to his chief engineer. At the trial Captain Saglietto testified that he had merely transmitted the conventional or code telegram without any foreknowledge of its purport or real meaning; that Admiral Lais on his visit in February had not discussed with him the matter of the conventional telegram and that on its receipt he had merely transmitted it to the respective officers in command of the ships. He admitted, however, that he was not surprised when he heard of the damage found aboard his vessel. His attitude was that of one who, while he was able truthfully to say that he had not been informed of the purport of the message sent through him tacitly admitted that he had a pretty good idea of its meaning and purpose. I do not think this rather hazy conflict in evidence is of importance here. The jury evidently believed that Captain Saglietto knew the purport of the messages he transmitted and there being evidence to support this view, upon which the jury was fully instructed, the finding of the jury on this question of fact must be adopted.

The captains of the other vessels all voluntarily admitted that they had given orders for the acts committed on their ships, this having been done promptly on receipt of the predetermined telegraphic message and in accordance with the orders of the Italian naval attache. Such members of the crews as were indicted were those who admitted to taking part in the destruction of the machinery on the orders of their officers. In fact, practically all of the evidence in these cases came from the defendants either in testifying at the trial or in the form of statements given before trial. Witnesses for the government testified to the fact of the damage found and its nature and extent. The proof of the identity of the persons committing it, the time when it was done, the source of the orders under which it

was done, all came from the voluntary statements of the defendants themselves, which were given without any apparent concealment or evasion. The position of the defendants was that their country was at war and that they had received orders from their superiors which their duty required them to obey without question. That in giving the orders for the acts done the captains of these vessels acted under orders of the Italian government is evident. And it is equally evident that the seamen who manually committed the acts were acting on orders of the ships' officers. These facts are undisputed. Likewise there is no dispute as to the extent and nature of the damage done. The testimony showed that the defendants had taken their orders literally and executed them thoroughly. They undoubtedly did a complete job in disabling the machinery which they were ordered to disable. Without attempting to recite in detail the damage done, it may be said that by the removal of certain vital parts of the machinery and the breaking of other parts, the main engine of the vessel and the machinery accessory thereto was so far wrecked as that, according to the testimony, it would require three or four months of time and the expenditure of $100,000 or more to repair the damage. It should be said, however, that equal care in obedience to orders was exhibited in the fact that the damage was confined to the machinery utilized in the propulsion of the ship. The auxiliary engine was not injured or placed out of operation and no other part or equipment of the vessel was injured. The result was to render the ship incapable of self-propulsion; she was like a vessel complete and intact except for machinery necessary to propel her.

There being no dispute of essential fact, the questions raised by the motion to set aside the verdict relate to the interpretation of the statute under which the indictment is laid and its applicability to the facts stated. It is urged by the defendants that the acts which the defendants committed did not come within the prohibition of the statute under which they are charged and further and more specifically that the evidence did not support a finding that any acts done were done with the intent designated by the statute and which is essential to the commission of any offense. The defendants protected their position by objections made throughout the trial and by motion for a directed verdict of not guilty. They now renew their contention by motion to set aside the verdict. While the motion to set aside asserts at least one other ground relating to the refusal of the court to continue the case, the real basis of the motion is that stated and it is this only which requires extended discussion. Briefly stated, the court is called on to consider whether it erred in refusing to direct a verdict of not guilty.

### The Substantive Offenses

The statute (18 U.S.C.A. § 502; 40 Stat. 221, Chap. 30, Title III, Sect. 1) heretofore quoted makes it unlawful, among other acts, for any person to *tamper* with the motive power or instrumentalities of navigation of the vessel with *intent to injure or endanger the safety of the vessel* or of persons on board. And it is this specific act which the indictment charges.

In the first place, it is urged that the statute does not prohibit acts such as here committed if done under authority of or by consent of the owners of the vessel or those having authority over its disposition. It is pointed out that the statute was enacted in June, 1917, shortly after the entrance of the United States into the last world war, and that its evident purpose was to protect shipping that might be going out of American ports from the acts of enemy agents or sympathizers who might seek by sabotage to impede America's war effort. There is pointed out also the reference to placing bombs or explosives aboard the vessel and the contemplated possibility that the injury to the vessel might occur after leaving port. It is particularly emphasized that the word "tamper" implies a surreptitious interference or meddling by one having no right or authority and it is urged that the purposeful use of this word by Congress, when taken with other parts of the text to which reference has been made, indicates that the statute was directed against the secret acts of unauthorized persons and not against an act done by the owner or those acting in authority over the vessel. This same question was raised by demurrer to the indictment, which was overruled. I am still of opinion that standing alone the contention cannot be sustained, i. e., that the terms of the statute do not necessarily exclude an act committed with the con-

sent and authority of the owner of the vessel. At the same time, I recognize that the circumstances under which the statute was enacted, as well as its language, may be considered in determining whether it applies to the state of facts here shown.

██ ██ This returns us to consideration of the question of whether the acts admittedly done were done with the intent prohibited by the statute and proof of which is an essential part of the offense. The language of the statute, "with intent to injure or endanger the safety of the vessel or of her cargo, or of persons on board * * *", is not easy of interpretation. The defendants have contended that the words *injure* and *endanger* both relate to the word *safety* and that the prohibited intent is to injure the safety of the vessel or endanger its safety. They point to the absence of commas following the word "injure" and preceding "the vessel" and to the expressions "of her cargo" and "of persons" correlated with "of the vessel" and all relating to the word "safety". Tested by any strict rule of grammatical construction, the language would seem to have the meaning contended for. But, in my opinion, it is not necessary to explore all the refinements of grammatical construction to arrive at the substantial meaning of the statute.

I think it reasonably clear that Congress intended that the prohibited intent should go further than a mere intent to injure the machinery (motive power) itself, and that the intent required is one to injure or endanger the vessel as a whole through tampering with its motive power; or, in other words, that the tampering with the motive power (or the other prohibited acts) should have been done with the intent that as a result thereof the vessel as a whole would be injured or endangered or that the persons thereon would be injured or imperiled. And it was upon this theory that the jury was instructed at the trial. The government contended that injury to the motive power was in itself an injury to the vessel within the meaning of the statute and that proof that the machinery had been intentionally damaged was all that was necessary to constitute proof of the offense charged. The court rejected this view and instructed the jury substantially that injury to the motive power of the vessel with the intention only of rendering the vessel incapable of naviga-tion under its own power was not sufficient; that it was necessary that the damage to the machinery should have been intended to endanger the safety of the vessel as a whole or the safety of the persons on board. To this, however, was added the instruction that if the natural and probable consequence of the dismantling of the machinery was to endanger the safety of the vessel or of persons on board, then the defendants were presumed to have intended such results.

Further consideration of the statute has convinced me that the interpretation sought by the government was properly rejected and that the instructions given the jury were, at least, substantially correct. The reasons for this are found, not only in the language covering the particular offense which these defendants are charged with, but in other provisions of the statute of which this section is a part.

The first objection to the position taken by the government is that if Congress intended that any intentional injury to the motive power of the vessel, regardless of the consequences thereof, should constitute the criminal act, it would have said so, and it could have been said in very simple language. All that would have been necessary would have been to prohibit tampering with the motive power of the vessel "with intent to injure said motive power", or "with intent to render the same incapable of operation", or some language of similar effect. Any declaration as to endangering the vessel, endangering its cargo, or endangering the persons on board would have been completely unnecessary and to no purpose if any intentional injury to the machinery standing alone constituted the completed offense. There would be no occasion to enumerate possible results of the injury to the motive power if the injury itself constituted the offense. It would then have been a crime regardless of the consequences that might follow or even if there were no consequences other than the mere injury to the motive power. But this is not what Congress said. On the contrary, it forbids tampering with the motive power with intent to produce certain results which the act recites.

It should be noted that in addition to the specifically enumerated acts of setting fires, placing explosives, tampering with the motive power, etc., the prohibition of

the statute extends to the doing of "any other act to or upon such vessel". This expression is plainly meaningless except as accompanied or explained by the intention or purpose with which such "other act" is done. Congress did not intend that the doing of "any act" upon the vessel should be a crime. "Any act" might be a perfectly harmless one or one having the purpose and result of improving its safety or its ease of navigation. The prohibition is aimed at acts done with a sinister purpose; that is, with the intention of accomplishing the harmful and dangerous results named in the statute. There can be no question of this. And when we consider the language used, "shall tamper with the motive power * * *, or shall place bombs or explosives * * *, or shall *do any other act"*, it is evident that the intent which must accompany the "other acts" is likewise applicable to the acts which are specifically enumerated. Neither the "other acts" nor those enumerated are made unlawful except as done with the intent which the statute sets forth.

But an even stronger reason for the construction which the court has adopted and for the denial of the contention of the government is found in an examination of the entire Act of Congress which contains the section under which these defendants are indicted. Reference to 40 Stat. page 217, shows the act as Chapter 30 of the acts of the 65th Congress. It is somewhat lengthy and is divided into various titles, reference to most of which is unnecessary here. The first portion of the act is Title I, 50 U.S.C.A. § 31 et seq., dealing with "Espionage". The next is Title II, 50 U.S.C.A. § 191 et seq., headed "Vessels In Ports Of The United States". Title III is headed "Injuring Vessels Engaged In Foreign Commerce" and contains one section only, being that under question here.

██ Under Title II, dealing with "Vessels In Ports Of The United States", it is provided in Section 3 thereof, 50 U.S.C.A. § 193: "It shall be unlawful for the owner or master or any other person in charge or command of any private vessel, foreign or domestic * * * within the territorial waters of the United States, willfully to cause or permit the destruction or injury of such vessel * * *." The maximum prison sentence for this offense is two years.

It will be noted that under this section there is no provision as to the intent with which the acts shall be done; intent is no part of the crime defined. Any willful injury to the vessel, regardless of intended consequences, is prohibited. It is true that the word "willfully" means knowingly and designedly and would necessarily require the act to be intentional and not an accidental happening; and that is evidently the distinction which is made in this section. It is this same definition or interpretation which the government seeks to apply to the section under which defendants are charged, namely, that any injury to the motive power is injury to the vessel and that proof of any intentional injury to the machinery is sufficient proof of guilt. Whether as a basis for this theory or for other reasons the indictment here was drawn to charge that these defendants did *"knowingly* and *willfully* tamper with"*, etc. *But* examination of the statute under which the indictment is laid (Title III) shows that neither knowledge or willfulness are named as elements of the crime defined. Neither of the words "knowingly" or "willfully", or any equivalent thereof, appear anywhere in the statute. In the definition of crime the "willful" doing of a particular act is not a substitute for or the equivalent of doing the act "with the intent" to accomplish certain named results. And it is the latter which this statute prohibits. The government cannot formulate a new definition of the crime or alter the nature of the offense by introducing into the indictment the unwarranted words "knowingly" and "willfully" as descriptive of the tampering.

If the defendants had been indicted under Title II, the argument that injury to the motive power of a vessel was an injury to the vessel within the meaning of that title might well be sustained. But Title III, under which the indictment is laid, prohibits tampering with the motive power *with the intent* that certain consequences should follow therefrom; which strongly argues that it was not the Congressional intent that any intentional injury to the motive power should in itself and regardless of intended consequences be construed as an intent to injure or endanger the vessel. If it had been otherwise, then, as heretofore pointed out, Congress would have defined the crime set

out in Title III as a tampering with the motive power with "intent to injure said motive power". Nothing more would have been necessary. If the contention of the government is correct, then the two sections cover the same offense. Under Title II it would be unlawful willfully to cause injury to any vessel; under Title III the offense would be in doing intentional injury to the machinery of the vessel which in turn would be construed as doing injury to the vessel. The first section would comprise the acts forbidden under the second.

■ It may be conceded that a certain state of facts may be such as to be covered by two penal statutes and be indictable under either. But we are here seeking to ascertain the intent of Congress in defining the crime with which these defendants are charged. And it is logical to presume that Congress, having in Title II provided punishment for any injury to a vessel, would not, in the same act and in a closely following section of that act, have provided for the same offense with a greatly different punishment. The wide disparity in the punishment provided by the two sections in question is of significance. Under Title II the maximum imprisonment is two years; under Title III it is twenty years. Surely it was not intended that any injury to a vessel, even to the extent (as stated in the act itself) of destruction of the vessel, should be punishable by a sentence of two years, while a mere disruption of the motive power should be punishable with a sentence of twenty years, even though unaccompanied by any further injury to the ship. If this was permissible, grave injustices might easily follow. Where the offensive act, as here, consisted of destruction of the machinery, one defendant might be indicted under Title III and imprisoned for twenty years. Another defendant, doing exactly the same thing, might be indicted under Title II with punishment limited to two years.

■ From these considerations, and another to be hereafter mentioned, it seems evident that in the enactment of Title III Congress was dealing with a different situation and one which it considered more reprehensible and dangerous than that covered by Title II. This difference in the nature of the acts forbidden by the two sections and in their gravity is to be found in the anticipated results of the acts forbidden by Title III—the intent with which they were done. This anticipated result, this intention which impelled Congress to fix severe punishment, was that the impairment of the motive power of the vessel should be followed by danger to the safety of the vessel or to those on board.

I think also that significance is to be attached to the fact that offenses dealt with in Title II relate to "Vessels In Ports", while Title III deals with "Vessels Engaged In Foreign Commerce". The first evidently intends to cover the case where a vessel is intentionally injured or wrecked with no intended purpose or result other than the prevention of use of the vessel or, possibly, the obstruction to navigation of other vessels. It applies to any vessel, even those which have no part in commerce. But Title III relating to "Vessels Engaged In Foreign Commerce" was aimed at acts of sabotage committed against vessels engaged in the transportation of materials or persons to foreign lands where the acts were intended to have the future result of endangering the safety of the vessel or the lives of the persons on board or the destruction of the cargo. The reference to bombs or explosives and to the possibility that the results of the forbidden acts might be intended to occur after the vessel had put to sea indicate the nature of the offenses which Congress sought to define and to which it attached the gravity indicated by the penalty provided.

■■ From these considerations it would appear that in any case arising under this statute where there is no evidence of an intent going beyond that of merely impairing or destroying the machinery of a vessel, then the offense is more nearly covered by Title II, which forbids the causing of any injury to the vessel. And it would equally appear that on any charge of a violation of Title III a necessary element of proof is that the injury done to the machinery was done with an intent going beyond that of mere impairment of the motive power and extending to further results designed to flow from the tampering with such motive power, namely, to imperil the safety of the vessel or the lives of those on board.

This is the view held by the court at the trial and in substantial conformity with which the jury was instructed. Courts are

not infrequently placed in the difficult situation of being forced, in the heat and haste of a trial, to construe legislation with which they have had no previous experience, upon which no authoritative construction had been previously placed and which, in the midst of a trial, they have little time to study. In such case it is to be expected that they may not be confident of their conclusions at the time. But, as I have already stated, subsequent careful study of this act has confirmed me in the belief that the interpretation adopted and for which reasons have been given herein is correct.

If the court is correct in its views as to the construction of this statute and as to the proof required to sustain a conviction on this indictment, then the question to be considered on the motion to set aside the verdict is whether there was sufficient evidence to sustain a conviction; and primarily, whether there was proof of the intent defined in the statute. This too has been carefully considered and I am of opinion that the proof did not justify the verdict.

The substance of the evidence, heretofore given, need not be repeated. In this particular case, the two seamen, Ratto and Maggi, stated only that they destroyed the machinery on order of their superiors; Captain Saglietto admitted only that he transmitted the order in code and denied actual knowledge of its purport. The government was, of course, in no position to prove what was in the minds of these defendants. So that there is no direct evidence of the intention of the defendants so far as it took form in their own minds. It can only be inferred from the circumstances and from such evidence as may bear upon it.

As stated, this was one of four cases tried, all dealing with the same facts and in the other three of which the ship captains testified. It is permissible, I think —and in fact necessary—to consider the facts disclosed in these other cases in any consideration of the instant case. It was these men who testified to the instructions given by the Italian naval attache, to the meaning of the code telegram transmitted through Captain Saglietto, and to the extent and purpose of the acts done in pursuance of this telegraphic order. The verdict rested upon a finding that Captain Saglietto received the telegram, knew its purpose and communicated it to his ship as an order to be carried out. In other words, the finding of the jury was that the acts charged against Captain Saglietto were based on and done in pursuance of the same message which he transmitted to the other captains, and it would be impossible to assume that Captain Saglietto's intentions were different from that of the others.

I think it clear that the only actual intention which may be imputed to these defendants was to damage the main engines (the motive power) of these vessels to the extent that the vessels could not be navigated and would be useless to any hostile interest into whose hands they might fall, except at the cost of the expense and delay of repairing the damage. Naturally, the extent of the damage done measured the length of time required for repair and the period during which the vessels would be useless. I can see little pertinency in the fact that the defendants wrecked the machinery to a point requiring great expense to repair. In no event could the extent of the damage be the test of guilt or innocence. Even under the contention of the government that any intentional injury done to the machinery rendered these defendants guilty, they would be equally guilty whether they completely destroyed the machinery or whether they removed only a few vital parts which could be easily replaced. And if, as the court has held, it is necessary that the "tampering" be accompanied by an intention to produce some further harm to the vessel or to those on board it, then it is immaterial to what extent the tampering went provided the required intent did not exist.

There is no direct evidence of the intention of the defendants except as embodied in the instructions given them by the naval attache and as carried out on receipt of the coded message. These instructions were to so disable the main engine of the vessel as to make it impossible to operate it; to injure no other part of the vessel or any other equipment; and to leave the auxiliary engine intact. These instructions were carried out literally. If I am correct in my understanding that the ship was without cargo and under instructions to take on none, there could have been no intended danger to cargo. We may certainly assume that the defendants did not intend to endanger the safety of their fellow countrymen, the crew of

the vessel, who continued to live aboard after the perpetration of this damage—and included in these were two of the defendants themselves. And since the safety of persons on board a ship is necessarily endangered if the safety of the ship is imperiled, I think we can assume that defendants had no intention or thought of putting their ship in danger. All evidence points out that so far as the actual intent of the defendants is concerned, they intended only to put the ship out of commission so far as that would be accomplished by disruption of its main engines; to put it in the position of a vessel without means of propulsion and, therefore, incapable of use.

There remains the question upon which the jury was instructed, that even if the defendants had no actual intent to endanger the vessel or the persons on board, nevertheless if the natural and probable consequence of the acts done was such as to endanger the vessel or the persons aboard it, the intent to do so would be presumed. In this connection, it was the contention of the government that, being deprived of the means of self-propulsion, the vessel could not be controlled or handled in case of emergency requiring its removal from its anchorage. It was contended that in case of storms it might be required that the engines be operated either to relieve the strain upon the anchors or to enable the vessel, after weighing anchor, to ride out the storm; that otherwise the anchors might drag or the anchor chains break, setting the vessel adrift and out of control with consequent danger to it and to other vessels in the harbor. But the testimony tending to support this was uncertain and indefinite. The testimony showed that vessels at anchor for any length of time customarily draw the fire in their main engines; and that under such conditions it would normally require from 20 to 24 hours to get up steam sufficient for propulsion of the ship; that, if, in this situation, movement of the vessel within the harbor was required it was much cheaper and quicker to summon a tug for the required movement, and that this was customarily done. The evidence indicated also that these vessels were anchored in a sheltered section of the harbor where the effect of any storm was least severe. It did appear that at some time following this happening the San Giuseppe had dragged her anchor and drifted from her mooring, but there was no evidence that this was attended by any harmful results to the vessel or that it could have been prevented had the main engines been intact.

It appeared also that storms of such nature and severity as to endanger shipping at anchor were of rare occurrence in Hampton Roads and that even when they occurred there was customarily such forewarning, from the weather bureau, of their approach as to enable any vessel to summon a tug for any movement required for its protection. And that if a sudden storm should come without warning there would be no opportunity to get up steam even if the engines were intact. The evidence was that tug-boat service in Hampton Roads was good in that the number of tugs was ample and one could be readily obtained at any time. Evidence as to possible peril of the ships from storms was gone into a bit more fully in the related cases tried following this one; and it was there shown in evidence that there were in use in transportation in and out of Hampton Roads a number of cargo ships from which the machinery had been removed. These were vessels built by the government during the World War which, after removal of their engines, are now moved by towing. It was shown that it is customary for these ships to be anchored in various parts of the harbor. It is true that these vessels had available when needed the service of a government tug assigned to the movement of a group of such vessels. But there was no evidence that this service was any more capable or more readily available than that which the commercial towing companies rendered to privately owned vessels in the harbor.

From this evidence, it would appear that there was very little danger to be anticipated from the elements to a vessel anchored in a sheltered section of this harbor merely because it was without means of self-propulsion. On the contrary, the indications are that any peril from this source was remote. And since the vessel retained, through its auxiliary engine, the ability to lower and raise its anchors and to operate its pumps in case of fire or leakage it would seem that its danger from any cause other than the weather was no greater than if its main engines had been intact. Considering the evidence as a whole, it is my opinion that it falls far short of showing that it was a

natural and probable consequence of the acts done by defendants that the vessel as a whole would be injured or that its safety would be endangered or that the persons on board would be imperiled. It follows then that the evidence fails to prove the intent with which the statute provides the "tampering" must be accompanied.

It seems to me clear that if these defendants are guilty of any crime it is for violation of Section 3 of Title II of the Act of June 15, 1917, 40 Stat. p. 220, 50 U.S. C.A. § 193, which has heretofore been discussed. Certainly that section is much more closely applicable to the facts here disclosed than are the provisions of the section under which the indictment is brought. The San Giuseppe, lying at anchor where she had been for nine months, with no cargo aboard and no intention of going to sea, comes more accurately under the description of a "[Vessel] In Port" than of one being then "Engaged In Foreign Commerce". And the fact that it is the owners, masters or other persons in command who are specifically named as the perpetrators of the acts of injury or destruction forbidden by Title II goes further to indicate the applicability of that title to the situation disclosed here. And if there is lack of proof of that intent which I have held to be required by Title III, then the offense is covered, if at all, only by Title II. As I have stated, it is not to be expected that Congress, having clearly defined an offense and prescribed for it a maximum punishment of two years imprisonment, intended, by another provision of the same legislation, that, upon the same set of facts, a defendant could be sentenced for twenty years. It has been suggested that such a situation does not exist and that the provisions of Title II, Sect. 3, apply only when the United States is at war or when a national emergency has been proclaimed—conditions not existing at the time of the alleged offense. This confusion may arise from the fact that the compilers of the United States Code have for some reason codified this section under Title 50, relating to war. But examination of the original act, 40 Stat. p. 220, discloses nothing to indicate that this section is applicable only in times of war or national emergency. The only reference to either of these conditions is in Section 1 of Title II, 50 U.S.C.A. § 191. There is no such reference applicable to the entire title or to the entire act. And even if Section 3 of Title II applied only in time of war or emergency, there would be even stronger reason to assume that Congress did not intend that an act invoking a punishment of only two years when done in times of national danger could be indictable under another section of the law and punishable with twenty years imprisonment if committed in times of peace.

It follows from what has been said that I am of opinion that the evidence was not sufficient to sustain a conviction on the charge for which defendants were indicted and that the verdict of the jury must be set aside.

### The Conspiracy Count

It seems desirable that there be some further discussion of the third count of the indictment under which defendants were charged with conspiracy to commit the acts for which they were substantively charged in the first and second counts. This is needed because, even if the court is in error in its construction of the statute, there are additional reasons why the conspiracy charge cannot be sustained. In this case, the court allowed the conspiracy charge to go to the jury, resulting in a verdict of guilty as to Captain Saglietto on that count. In another of the cases, tried later and after greater opportunity for consideration (United States v. Belgrano et al.), the court directed a verdict of not guilty on the conspiracy count. I am of opinion that this latter action was correct and that I erred in not taking similar action in the instant case.

These defendants were citizens of a nation which was at war and they were under the command of the naval authorities of their country. They did not conceive or plan the acts which were done; they were ordered by a superior officer in the military service to do certain things and they gave that order the prompt and literal obedience which their position demanded of them. They had no choice nor decision to make, unless to disobey and thereby subject themselves to the grave penalties which all governments are accustomed to visit upon those in the military service who refuse to obey orders in time of war. It is not meant to imply that the defendants obeyed protestingly or only after a considered weighing of the possible results of disobedience. There is no evi-

dence to this effect. On the contrary, the evidence is that they obeyed without question. But this does not alter the fact that what they did was done solely because of and in response to a military command.

 An essential of a conspiracy is that there should be an agreement or understanding willingly entered into by all the parties to it for the accomplishment of an unlawful purpose. It necessarily involves a concert of action, not in the performance of the overt act, but in reaching the agreement or understanding which is the first necessary element of conspiracy and in pursuance of which the overt acts must be done. But a person in the military service who carries out the order of a superior officer is not acting in pursuance of any agreement or understanding previously entered into by the concerted action of himself and his superior and where his participation in the agreement was the result of his own choice. On the contrary, he is acting under the compulsion of the grave penalties which military law traditionally prescribes for nonobedience to military orders. Participation in a crime actuated solely by the compelling fear of personal harm negatives the very requisites of conspiracy. It would be a strained conception of conspiracy to hold that it covers the relationship between a military officer who gives an order and a soldier who is compelled to obey it.

The Motion in Arrest of Judgment

I do not think the motion in arrest of judgment is well taken when considered from the standpoint of the proper and technical basis for such motions. It is too well settled to require citation of authority that motions in arrest of judgment lie only for errors apparent on the face of the record. So far as this motion asserts grounds resting on this basis it is without merit. In the situation existing here, where the court has before it both a motion to set aside a verdict and a motion in arrest of judgment and has upheld the former while holding the latter without merit, I find no prescribed procedure for the consistent disposition of both motions. A suitable course would seem to be that approved in Williams v. State, 121 Ga. 579, 49 S.E. 689, where the motion to set aside was granted and the motion in arrest was then dismissed; and this course will be followed in the order in this case.