**GIUGNI et al. v. UNITED STATES.**

No. 3700.

Circuit Court of Appeals, First Circuit.

May 8, 1942.

Homer L. Loomis, of New York City (James R. Beverley, of San Juan, P. R., on the brief) for appellants.

Walter L. Newsom, Jr., of San Juan, P. R., for appellee.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

The defendants were found guilty by a jury on both counts of an indictment charging them with conspiring with one another to commit and with committing the crime of wilfully damaging and destroying the motive power of a vessel of foreign registry "with intent to injure and endanger the safety of said vessel," which at the time the acts were done was within the jurisdiction of the United States. After verdict the defendants were sentenced to terms of imprisonment in an institution of the penitentiary type, and they appealed.

The named defendant was the Captain, and the other defendants were the officers and crew, of the tanker Colorado; a vessel admittedly of Italian registry. On June 7, 1940, the Colorado, being in ballast, put into the harbor of San Juan, Puerto Rico, for the purpose of taking on bunkers, that is, 150 tons of fuel oil for use to fire her boilers. No cargo of any sort was either taken on or discharged. While waiting for the fuel oil to be delivered the vessel was seized by the United States Marshal acting under orders made by the United States District Court for Puerto Rico in admiralty case No. 1 entitled Asiatic Petroleum Company v. SS Colorado et al., and deputy United States marshals were assigned to guard the ship both day and night. On June 10, 1940, Italy entered the war as a belligerent and a day or two later, by permission of the port authorities, the fires under the ship's boilers were extinguished.

On November 4, 1940, by order of the District Court the vessel was moved from its anchorage to a point in the San Antonio channel and there securely moored alongside the shore where it remained until May 7, 1941, when it was towed away by the United States Coast Guard. On March 30, 1941, officers and men of the United States Coast Guard boarded the Colorado for the purpose of making an inspection of its moorings and general condition, in the course of which they discovered that the main engine and its auxiliaries, and the boilers and their auxiliaries in the fireroom had been extensively damaged, apparently deliberately. In consequence they arrested all of the ship's officers and crew who until that time had been continuously living on board.

The testimony indicates that Captain Giugni, pursuant to instructions given to him by the Naval Attache of the Italian Embassy in Washington, gave orders to his subordinates for the damaging of the propulsive machinery of his ship, and that the orders were carried out under his supervision during the latter part of March, 1941. The defendants do not deny this, but contend that the damage was done not for the purpose of endangering the safety of the vessel, but only for the purpose of immobilizing it in order to prevent its use by an enemy nation.

The statute under which the indictment was laid, 18 U.S.C.A. § 502, reads, so far as here material, as follows:

"§ 502. Injuring vessels engaged in foreign commerce.

"Whoever shall set fire to any vessel of foreign registry, or any vessel of American registry entitled to engage in commerce with foreign nations, * * * or to the cargo of the same, or shall tamper with the motive power or instrumentalities of navigation of such vessel, * * * while within the jurisdiction of the United States, or, if such vessel is of American registry, while she is on the high sea, with intent to injure or endanger the safety of the vessel or of her cargo, or of persons on board, * * * shall be fined not more than $10,-000, or imprisoned not more than twenty years, or both."

The points upon which the defendants rely are (1) that this statute is not applicable to them; (2) that the indictment under which they were tried is insufficient; (3) that the evidence is not sufficient to sustain their convictions; and (4) that the statute, as applied, violates the Fifth Amendment to the Constitution of the United States.

Specifically, under the first point, the defendants contend (1) that the statute applies only to trespassers and not to the owner of a vessel or to its officers and crew; (2) that it applies to ships of foreign registry only when such ships are engaged in foreign commerce, but not to ships of foreign registry laid up in ports of the United States; and (3) that it does not apply to them (the defendants) because it

applies only to acts done with both a general criminal intent to perpetrate a wrong and a specific intent to injure the safety of a vessel, neither of which intents can, on the evidence, be imputed to them. We are of the view that all of the contentions made under this point are without merit.

■ The defendants advance two principal arguments in support of their contention that the above statute, in spite of the broad sweep of its language, does not apply to the owner of a vessel or to its officers or crew. They say, first, that the statute defines only an offense against private property, like a statute defining burglary or malicious mischief for instance, and so, in conformity with the common-law principle which makes statutes of this latter sort inapplicable to an owner who breaks into his own house or destroys his own property, there must necessarily be implied in the statute in question an exception in favor of the owner of a vessel, and that this exception includes an owner's agents, if, in damaging the vessel, they act within the scope of their employment; and second, that the history of the statute clearly indicates that if Congress had intended to include ship-owners and their agents within its scope, it would have expressly so provided. In our view the history of the statute refutes both of these arguments.

Section 502 was originally enacted as Title III of Chapter 30 of the Public Laws of the United States passed by the Sixty-Fifth Congress. 40 Stat. 217, 221. This chapter, which bears the title "An Act to punish acts of interference with the foreign relations, the neutrality, and the foreign commerce of the United States, to punish espionage, and better to enforce the criminal laws of the United States, and for other purposes", was approved and became law on June 15, 1917. It seems to us clear from the wording of the statute and from the date when it was enacted that Congress must have had in mind and sought to prevent a repetition of acts of deliberate destruction similar to those done on their own ships shortly before by the crews of German vessels at that time in our ports, the results of which acts, at the time the statute was passed, were seriously delaying and impeding our war effort. But, the defendants argue, Congress dealt with the above situation when it enacted § 3 of Title II of the above chapter 30, 50 U.S.C.A. § 193, which in part provides that "It shall be unlawful for the owner or master or any

other person in charge or command of any private vessel, foreign or domestic, or for any member of the crew or other person, within the territorial waters of the United States, wilfully to cause or permit the destruction or injury of such vessel." We do not agree.

■ By its § 1, Title II, 50 U.S.C.A. § 191, is applicable only after the President has declared that a national emergency exists "by reason of actual or threatened war, insurrection, or invasion, or disturbance or threatened disturbance of the international relations of the United States", and it has been held that "emergency pervades the whole title", including its section 3. Marchese et al. v. United States, 5 Cir., 126 F.2d 671, 674; United States v. Martini, D.C., 42 F.Supp. 502, 507, 508. Title III, on the other hand, contains no such emergency clause and from this it seems to us that the above cited cases are correct in holding that the two titles are independent. So, construing the titles together as parts of the same enactment, it seems to us that Congress in Title II, 50 U.S.C.A. § 191 et seq., provided for the protection of private vessels, foreign or domestic, during and after the declaration of a national emergency, without regard to the specific intent with which the actor injured the vessel; but, not satisfied with that, it then went on and in Title III, 18 U.S.C.A. § 502, provided protection for similar vessels even before a national emergency has been declared to exist, provided the forbidden act was done with the specific intent required.

The defendants seek to support their contention that if any statute applies it is § 3 of Title II, by citing to us the legislative history of the two separate bills which later were enacted as Titles II and III. But this history, in so far as it has any force to support the defendants' contention, does not seem to us sufficient to overcome the plain wording of the titles themselves.

Considering the wording of the titles and the date when they were enacted into law, we are of the opinion that by both of them Congress intended not only to protect an owner of a vessel against the malicious acts of others but also to protect the interest of the public in the vessels themselves as instrumentalities usable in foreign commerce. This is clear as to Title II, which explicitly forbids wilful acts of destruction by "the owner or master or any other person in charge or command" as well as by "any member of the crew or other person,"

but, the defendants argue, had Congress intended to include the same classes of persons within the prohibition of Title III it would have used the same or similar language in that title instead of the word "whoever". To be sure Congress might have done as the defendants suggest and thereby have avoided any possible ambiguity or question, but "whoever" is a pronoun of broad and all inclusive scope and in using it we think Congress intended to use it literally and thus to bring within the ambit of Title III owners, masters, officers and crew members as well as outsiders.

In addition the defendants argue that the use by Congress of the word "tamper" precludes the application of Title III to any person other than an outsider for the reason that "tamper", in its ordinary acceptance, comprehends only acts of meddlesome interference by persons other than an owner or his agents. This argument deserves but brief consideration. The word does not necessarily have the limited significance attributed to it by the defendants. See Webster's New International Dictionary (2nd Ed.); Bersio v. United States, 4 Cir., 124 F.2d 310, 314.

The fact that Congress, while providing for a maximum fine of $10,000 for violation of either title, provided a maximum of only two years' imprisonment for violation of Section 3 of Title II, but provided a maximum of twenty years imprisonment for violation of Title III, we admit, militates against the view which we take of the chapter as a whole. However we do not think that the discrepancy between the limits of punishment permissible under the two titles is sufficient to overcome what seems to us to have been the clear and obvious intention of Congress.

We come now to the argument that the statute applies to ships of foreign registry only when actually engaged in foreign commerce, but not to those of foreign registry laid up in our ports. The statute by its terms applies to two classes of ships; (1) vessels of foreign registry in our ports and (2) vessels of American registry entitled to engage in commerce with foreign nations whether in our ports or on the high sea. Clearly the only vessels of foreign registry likely to be found in our ports would, if usable at all, be usable to at least some extent in foreign commerce, otherwise they would not be here, while vessels of American registry might or might not be so usable. Therefore, it was wholly appropriate for Congress to have done what it obviously did, that is, use the language "entitled to engage in commerce with foreign nations" only in limitation of the phrase "vessel of American registry", and leave the phrase "vessel of foreign registry" without that limitation. Therefore, as to vessels of foreign registry there is no limitation as to whether or not they are engaged in or are usable in foreign commerce,—such usefulness being important only with respect to vessels of American registry. Bersio v. United States, 4 Cir., 124 F.2d 310, 313, 314.

The defendants seem to argue that their convictions cannot be sustained unless it is shown that in damaging the machinery of their ship they knew that they were violating a law of the United States. It needs no citation of authorities to support the statement that ignorance of the law is no excuse for its violation. The question is not whether they knew that they were breaking the law, but whether they knew that they were breaking the machinery of their ship. Obviously one does not put emery dust and grinding compound in bearings or strike machinery with sledge hammers and chisels unwittingly and without intending to damage or destroy it. Clearly the acts of damage and destruction were done on purpose and this is all that is necessary to show a general criminal intent.

There remains to be considered the question of whether or not the defendants harbored the specific criminal intent required for conviction under the statute. The intent required is "to injure or endanger the safety of the vessel or of her cargo, or of persons on board". This language is not altogether clear as pointed out in the Bersio and Marchese cases cited above. However, without attempting to add to or improve upon what was said in those cases concerning the above quoted language, we think that it is clear enough that Congress intended to penalize acts of destruction done with intent either to injure the vessel, her cargo, or persons on board or to endanger the safety of either the vessel, her cargo, or of persons on board. This is the conclusion reached by the Circuit Court of Appeals for the Fifth Circuit in the Marchese case on reasoning which we find satisfactory.

In the case at bar the acts done by the defendants in the engine and boiler rooms of the Colorado were such that the ship thereafter was not only unable to move under its own power, but also was unable to pump out its own bilges in case it should spring a leak, or supply water to its fire hoses in case it should catch on fire. From this it seems clear enough that not only was the ship injured, but its safety, and the safety of those on board were endangered (See Southern Steamship Co. v. N. L. R. B., 62 S.Ct. 886, 86 L.Ed. ——, decided by the Supreme Court of the United States on April 6, 1942), and that such was the natural and obvious result of what the defendants did, and that the jury was warranted in finding that the defendants intended this natural consequence of their acts.

■ Obviously we cannot give Captain Giugni criminal immunity on the ground that in doing what he did he acted under orders of the Italian Naval Attache in Washington without violating the rule against giving extra-territorial effect to acts of a foreign government, nor can we give immunity to the officers and crew on the ground that they obeyed the orders of their employer transmitted through his agent, the captain. It requires no citation of authorities to support the proposition that an employee is not immune from punishment for his criminal acts for the reason that those acts were done on his employer's orders.

■ The question of coercion remains. The Captain testified that he was the only armed man on board; that his officers and men were aware of that fact; that he carried his revolver in plain sight when giving orders for the demolition of the ship's machinery, and that he would have shot any man who refused to obey. This is not enough to prove coercion. There is no evidence of any reluctance on the part of anyone on board to carry out the orders given, and since the work of destruction was done over a period of two weeks during which time the ship was tied up alongside the shore, anyone who wished could have escaped ashore and sought sanctuary with the authorities, had he been so inclined, and thus escape coercion.

As to all but twelve of the men on the ship there was evidence of direct participation in the work done in the engine and boiler rooms. But there is, we think, evidence from which it could reasonably be inferred that the twelve men not shown to have directly participated, aided and abetted the criminal acts of those who did, and thus were principals in the crime. 18 U.S.C.A. § 550. It appears that the work of demolition below decks was accompanied by a great deal of noise and so, in order to conceal that noise from the deputy United States marshal who was on board, members of the crew not engaged in the actual work of destruction carried on noisy work on deck, like chipping paint, or beguiled the deputy marshal into parts of the ship remote from the engine room and there kept his attention distracted so that he would not discover the activity below. Considering the size and nature of the vessel and the small number of men on board, we think the evidence is sufficient to support the inference that all on board knew what was going on in the engine and boiler rooms (there is no evidence of any attempt to keep that activity secret from any crew member), and that all either actively engaged in that work or aided and abetted it.

■ From what has been said it is evident that the indictment was not insufficient for the reason that it failed to allege the ownership of the vessel and this is the only ground advanced in support of the proposition that the indictment was insufficient. As we construe the statute, criminal liability does not in any way depend upon ownership and thus ownership does not have to be either alleged or proved.

■ Only the constitutional arguments remain to be considered. The defendants' argument that the construction which we put upon the statute renders it unconstitutional in that it deprives ship-owners of their property without due process of law is based upon the erroneous assumption that, under our construction of the statute, a ship-owner is forbidden to remove the machinery from his vessel in order to make repairs upon it or to convert his ship into a barge or house-boat. Obviously this is not so. Only tampering, which might include the removal of, a ship's machinery or instruments of navigation with the intent to injure or impair the safety of the ship is forbidden, not tampering for any other purpose. As we construe the statute it embodies a reasonable, and therefore a constitutional, limitation by Congress upon a ship-owner's right to do with his property as he will.

A complete answer to the contention that the statute is unconstitutional on the ground that it is so vague that no one can determine what conduct is forbidden by it and what is not appears in Bersio v. United States, 124 F.2d 310, 315. We agree with the Circuit Court of Appeals for the Fourth Circuit when in that case it said that in the statute "a standard is prescribed which there is no difficulty in anyone's understanding."

Since in each case the sentence imposed on the substantive count was greater than that imposed on the count for conspiracy, and since in each case the sentences imposed were ordered to run concurrently, all questions raised with respect to the conspiracy count alone have become moot. Deacon v. United States, 1 Cir., 124 F.2d 352, 360.

The judgments of the District Court are affirmed in respect to the sentences imposed under the substantive count; the appeals from the judgments in respect to the sentences imposed upon the conspiracy count are dismissed as moot.