UNITED STATES of America,
Plaintiff-Appellee,

v.

Motto FRANICEVICH, Defendant-
Appellant.

No. 71–2194.

United States Court of Appeals,
Fifth Circuit.

Aug. 9, 1972.

Rehearing Denied Aug. 29, 1972.

Virgil M. Wheeler, Jr., New Orleans, La., for defendant-appellant.

Gerald J. Gallinghouse, U. S. Atty., Patrick C. McGinity, Mary Williams Cazalas, Asst. U. S. Attys., New Orleans, La., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and RIVES and CLARK, Circuit Judges.

RIVES, Circuit Judge:

A one count indictment charged that Franicevich conspired[1] with Calvin J.

1. In violation of 18 U.S.C. § 371.

Pelas, Sr., a coconspirator but not a co-defendant, to violate 18 U.S.C. § 2275[2] "by wilfully and feloniously removing the engines and navigational instruments of a vessel of the United States, *with the intent to injure or endanger the safety of said vessel.*" (Emphasis added.) Upon a jury's verdict of guilty, the district court entered a judgment of conviction and sentenced Franicevich to imprisonment for a period of 42 months. Franicevich appeals and we affirm.

Franicevich's opening brief succinctly states the issues presented by this appeal as follows:

"I. Whether sufficient evidence exists in this record to sustain the conviction.

"II. Whether the denial of appellant's Requested Jury Instructions was improper and constituted substantial prejudice.

"III. Whether the admission of prior guilty pleas made by the named coconspirator and three other government witnesses to the identical substantive offense charged in this indictment was erroneous and constituted substantial prejudice."

### I. *Sufficiency of the Evidence.*

Most of the facts were established without dispute. McKinney Boat Rental, Inc., purchased new the Crewboat MANTARAY in December, 1968, for $44,527.74. Some seven months later, on July 13, 1969, the MANTARAY was stolen from her mooring. Her two 6–71 G.M. diesel engines were thereaft-er removed and loaded on a boat owned by the named coconspirator, Calvin Pelas, Sr. The MANTARAY was also stripped of her radar and navigational equipment, which was abandoned and thrown in the Gulf. Holes were burned in the side of the vessel along the water line and she was incompletely sunk in the Gulf. The Coast Guard promptly found the partially sunken vessel. Within a few days the missing engines were discovered on a boat owned by the named coconspirator. Pelas, Sr., his son Calvin Pelas, Jr., and four other men were arrested and charged with the substantive offense of willfully and feloniously tampering with the MANTARAY by removing her engines and navigational instruments and by the commission of other acts to and upon the vessel in violation of 18 U.S.C. § 2275. All six pleaded guilty to the substantive offense and were sentenced. Franicevich alone was charged with conspiracy.

Four of the six men who had pleaded guilty to the substantive offense in connection with the sinking of the MANTARAY testified against Franicevich. Several other witnesses also testified for the Government. No evidence was offered in behalf of Franicevich.

The jury could determine from ample evidence that Franicevich was building a crewboat for which he needed two motors of the type stolen from the MANTARAY, and that he conspired with Calvin Pelas, Sr., to acquire such motors by theft. According to Blanchard, Pelas, Sr., "said he wanted me to help to get him some diesel 6–71 en-

2. "§ 2275. *Firing or tampering with vessels*

"Whoever sets fire to any vessel of foreign registry, or any vessel of American registry entitled to engage in commerce with foreign nations, or to any vessel of the United States, or to the cargo of the same, or tampers with the motive power or instrumentalities of navigation of such vessel, or places bombs or explosives in or upon such vessel, or does any other act to or upon such vessel while within the jurisdiction of the United States, or, if such vessel is of American registry, while she is on the high sea, *with intent to injure or endanger the safety of the vessel or of her cargo,* or of persons on board, whether the injury or danger is so intended to take place within the jurisdiction of the United States, or after the vessel shall have departed therefrom and whoever attempts to do so shall be fined not more than $10,000 or imprisoned not more than twenty years, or both." (Emphasis added.)

gines for his boat, and he didn't care where I got them." Pelas, Sr., testified:

"A. * * * I seen Mr. Franicevich, and I asked him if he would be interested in them, so he told me he would, so I told him I needed $500 for the engines, plus I wanted a thousand dollars because I had to use my equipment to get them out, but he wouldn't give me a thousand dollars. He gave me $900.00.

"Q. When you say you would have to use your own equipment, what do you mean?

"A. Well, I had to use my A-frame, and all, to pull them out of the boat.

"Q. Did you discuss with Mr. Franicevich the amount of work that would be involved, in addition to the use of your A-frame, in making this thousand dollar estimate?

"A. Yes, sir. I told him I would have to hire a tug to push my barge, and all, to that location."

(App. 179.) Franicevich furnished to Pelas, Sr., the $500.00 to be paid for the motors and, according to Pelas, Sr., "He told me not to give it all to him at one time—not over half." In turn, Pelas, Sr., paid Blanchard $200.00 before the MANTARAY was stolen and $300.00 when Blanchard delivered the MANTARAY. Pelas, Sr., told Blanchard that the money came from Franicevich. Further, on the prosecutor's redirect examination Blanchard testified that he had a conversation with one Billy Sircovich in the presence of Franicevich and that,

"A. Mr. Sircovich said they were concerned with the testimony that I may have given in this case. Motto [Franicevich] said he had a lot of money, and he showed it to me, and I said I just wanted the $500 I had coming for getting the engines, but since that didn't work out,

that was that, and they said they were going to kill Pelas—Calvin Pelas and throw him in the river.

"BY THE COURT:

"Q. Who said that?

"A. Billy Sircovich, and he said they were going to burn Calvin Pelas' house down with his family in it.

"Q. Did they threaten you?

"A. Yes, sir; not right out like that, but they told me I knew what they were talking about, and they told me not to say anything.

"Q. Who said that?

"A. Billy Sircovich.

"Q. Franicevich was with him, you say?

"A. Yes, sir, right there. They made it clear what would happen if anybody talked, if I said anything."

(App. 145, 146.)

When Pelas, Sr., reported to Franicevich that,

" * * * I had the engines in my boat up at Empire, and he said OK, and I said I would like to have my money, and he went in the house, and when he came back out, he gave me a check for $900, and he told me then that he was coming up to Empire to see the engines, and so him and 'Junior' Buras came up.

"I got in my truck with Marshall Dixon and drove on back up to Empire, over to the Mosquito Control Unit, and had a cup of coffee, and then Motto [Franicevich] and 'Junior' Buras got there, and they boarded my boat and looked at the engines, and then Motto said he would like to have the boat brought down to Buras, so I asked Melvin if he would tow it down to Buras for me, and he agreed to do it for me.

"So we went on down to Buras with it, and Motto met us in the river, and he got in the boat with us, and he

told us to bring it into the slip, his slip, so we brought it into his slip, which is alongside the river, and we tied it up on the side of the slip.

"After Motto tied it up, I took my tow off, and Melvin and I went back to Empire."

(App. 186, 187.)

The fact that Franicevich went on the boat owned by Pelas, Sr., to view the two motors was corroborated by the testimony of Calvin Pelas, Jr., and of Arthur Buras, Jr. Franicevich's $900.-00 check to Pelas, Sr., was cashed by a merchant, Thomas Ray Langston, who testified that the bank reported insufficient funds for payment of the check and "Mr. Franicevich's bookkeeper brought me $900.00 all in $20.00 bills."

The jury might well have taken the same view of the evidence as that expressed by Judge Christenberry when imposing sentence:

"I think it is perfectly clear in this case that this defendant is the evil genius of this whole thing. These other people stole that $50,000 boat, stole the engines, threw the equipment overboard, and the boat was sunk.

"The only thing they kept was the two motors that were taken out of the boat. In other words, this boat was stolen so that this defendant could get two new motors. I think that was established beyond any reasonable doubt, any possible doubt, and the jury found him guilty."

(App. 260.)

While the evidence was thus ample to prove that Franicevich and Pelas, Sr., conspired together from the very beginning of the plot, some questions of law remain as to whether their conspiracy was to violate 18 U.S.C. § 2275 (quoted in n. 1) as charged in the indictment,

that is "by wilfully and feloniously removing the engines and navigational instruments of a vessel of the United States, with the intent to injure or endanger the safety of said vessel." Franicevich's counsel stipulated that the MANTARAY is a vessel of the United States:

"MR. WHEELER: Your Honor, we will stipulate that it is a vessel of the United States. We are not making any dispute about that at all.

"THE COURT: All right. Let it be admitted then."

(App. 76).[3]

Franicevich's counsel vigorously urges, however, that there is not sufficient evidence to prove the intent charged in the indictment, i. e., "with the intent to injure or endanger the safety of said vessel." Franicevich's position was made clear to the district court by his requested instruction No. VI:

"As a necessary element of the defense for which the defendant is being prosecuted, it must be proved beyond a reasonable doubt that he, Motto Franicevich, willfully and knowingly entered into an agreement with Calvin J. Pelas, Sr., the object or purpose of which was to commit an offense against the United States in that they were to feloniously and unlawfully remove the engines of a vessel of the United States with the intent to injure or endanger the safety of that vessel.

"I charge you that the prohibited intent must go further than a mere intent to remove the engines themselves, and that the intent required is one to injure or endanger the vessel as a whole through the removal of the engines.

---

3. That much also seems clear from 18 U.S.C. § 9:

"§ 9. *Vessel of the United States defined*

"The term 'vessel of the United States,' as used in this title, means a vessel belonging in whole or in part to the United States, or any citizen thereof, or any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof."

"In other words, if you find that there was an agreement to merely remove the engines of a vessel of the United States with the intention only of rendering that vessel incapable of navigation under its own power, you must then acquit the defendant."

Franicevich's contention as to the intent required by the statute is supported by two district court decisions—United States v. Saglietto, E.D.Va.1941, 41 F. Supp. 21, 26, et seq., and United States v. Martini, S.D.Ala.1941, 42 F.Supp. 502, 510. However, the Fourth, Fifth, Third and First Circuits have decided differently. In Bersio v. United States, 4 Cir. 1941, 124 F.2d 310, cert. denied 316 U.S. 665, 666, 62 S.Ct. 1033, 86 L.Ed. 1742, Judge Parker said in part:

"The question then comes down to this: Was the evidence sufficient to establish intent 'to injure or endanger the safety of the vessel'? We think that it was. In this connection, we think it clear that the language of the statute is properly interpreted as requiring intent to injure the vessel or endanger her safety; for no one speaks of injuring the safety of an object. Such interpretation is seen to be manifestly correct if the words, 'or endanger the safety of', be set off by commas; and the subsequent phrase of the section, 'whether the injury or danger is so intended to take place within the jurisdiction of the United States, or after the vessel shall have departed therefrom', shows clearly that what was contemplated as embraced within the prescribed intent was injury itself as well as danger or the impairment of safety. * * *

" * * * We have carefully considered Judge Paul's opinion to the contrary in United States v. Saglietto, D.C., 41 F.Supp. 21, but we are not convinced by it. We think that it does not give sufficient scope to the phrase of the section 'whether the injury or danger is so intended to take place within the jurisdiction of the United States, or after the vessel shall have departed therefrom.' "

124 F.2d 314, 315.

In Marchese v. United States, 5 Cir. 1942, 126 F.2d 671, 674, Judge Sibley wrote for this Circuit in part as follows:

"All the acts named, whether done or attempted or conspired about, must be with 'intent to injure or endanger the safety of the vessel, or of her cargo, or of persons on board.' There is in this specification of intent plainly an ellipsis, words left out, to be supplied from the context. The word 'injure' is a transitive verb, requiring an object, but none immediately follows it. Is its object to be taken to be the noun 'safety' in the phrase 'endanger the safety', or are the nouns 'vessel', 'cargo' and 'persons' the objects meant? 'Endanger the safety' is a common expression to signify jeopardy without actual injury inflicted. 'Injure the safety' is a most unusual expression, injury being commonly affirmed as done to a person or a concrete thing. We think the natural meaning fully expressed is this: 'With intent to injure the vessel, her cargo, or persons on board, or to endanger the safety of the vessel, or of her cargo, or of persons on board.' If in interpreting a criminal statute we may regard its legislative evolution, we will find confirmation of this interpretation."

In United States v. Scaleggeri, 3 Cir. 1942, 126 F.2d 1023, that Circuit expressed itself as "in entire agreement with the reasoning" of the Fifth Circuit in *Marchese* and also as agreeing with the Fourth Circuit in *Bersio*.

In Giugni v. United States, 1 Cir. 1942, 127 F.2d 786, 790, Judge Woodbury wrote:

"There remains to be considered the question of whether or not the defendants harbored the specific criminal intent required for conviction under the statute. The intent required is 'to injure or endanger the safety of the vessel or of her cargo, or of persons on board'. This language is not altogether clear as pointed out in the Bersio and Marchese cases cited above.

However, without attempting to add to or improve upon what was said in those cases concerning the above quoted language, we think that it is clear enough that Congress intended to penalize acts of destruction done with intent either to injure the vessel, her cargo, or persons on board or to endanger the safety of either the vessel, her cargo, or of persons on board. This is the conclusion reached by the Circuit Court of Appeals for the Fifth Circuit in the Marchese case on reasoning which we find satisfactory."

It may be added that in United States v. Polonio, D.Or.1941, 77 F.Supp. 768, Judge Alger Fee expressed like views and more specifically wrote:

"A ship or vessel is not the hull alone, but consists of the engines and other integral portions thereof. Therefore, according to the interpretation of the Court, an intent to injure the vessel would be satisfied by finding of an intent to injure the integral parts thereof, such as the main engines." (Footnote omitted.)

77 F.Supp. 771.

We conclude that the evidence was clearly sufficient to sustain the conviction under the particular statute as charged.

## II. *Requested Jury Instructions.*

■ Franicevich's requested instruction VI has already been fully considered. The only other requested instruction urged on appeal is No. VII, reading as follows:

"*Accessory after the fact.*

"Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact."

This, Franicevich argues, was a "defense theory" on which he was entitled to an instruction. We do not agree. Franicevich may well have been guilty both of conspiracy as charged and of being an accessory after the fact. He could not restrict the Government to a prosecution for the lesser offense.

## III. *Guilty Pleas of Government Witnesses.*

■ On his third point, Franicevich's sole reliance is upon United States v. Harrell, 5 Cir. 1970, 436 F.2d 606. It is obvious that Franicevich's position is an afterthought and is without merit.

*Harrell* contains a full discussion of certain circumstances under which pleas of guilty by a coconspirator as to either conspiracy or the substantive offense will affect a defendant's substantial rights and amount to "plain error" under Rule 52(b), F.R.Crim.P. This case does not present such circumstances.[4]

Not only did Franicevich register no objection at the trial, but he readily recognized from the beginning to the end, from the opening statements to the final arguments, that the proper and natural way to present the evidence was to show admitted commission of the substantive offense by six other persons both as affecting the credibility of the four of those persons who testified[5] and as an orderly way of narrating the evidence.

The prosecutor's opening statement to the jury disclosed, without objection,

"Now, six men entered pleas of guilty in this court, ladies and gentlemen, to charges of tampering with a vessel and they were sentenced by the Court. They were George Blanchard, Calvin Pelas, Sr., Jim Boyd, Marshall Dixon, Calvin Pelas, Jr., and Pat Bowers.

"The defendant in this case, Mr. Franicevich, was not charged in that indictment, because the government is

4. The recent case of United States v. Johnson, 5 Cir. 1972, 455 F.2d 311, vividly illustrates that on this point each case depends upon its own particular facts and circumstances.

5. It is important to note that the distinction between conspiracy and the substantive offense was repeatedly made clear, and that neither Pelas, Sr., nor any other witness had pleaded guilty to conspiracy.

not accusing him of tampering with that vessel, but the government is accusing him of conspiracy—with unlawfully, willfully, knowingly and feloniously conspiring to remove the engines and navigational instruments of a vessel of the United States, with the intent to injure or endanger the safety of said vessel." (App. 70.)

Franicevich's counsel in his opening statement responded in part as follows:

"That vessel was cut up and sunk by six other people. You heard counsel give you their names, and you heard him say they all pleaded guilty in this court, and they were sentenced, but on what charge? Not conspiracy —no; tampering with a vessel.

"That's what that was all about, tampering with a vessel. Now, what about Motto Franicevich? He wasn't charged with tampering with a vessel. Why not? Because he wasn't there. He wasn't anywhere near that place when all that was done.

"So those six men pleaded guilty and were sentenced, and then what happened?"

(App. 71–72.)

Indeed, that the commission of the substantive offense by six other persons fitted into the strategy of Franicevich's defense appears clear throughout the record, including his counsel's closing argument to the jury:

"There is no question that that happened. Six men participated in it, were indicted, entered pleas, and were sentenced. Motto Franicevich was not one of them. He is not charged with doing any act on that vessel.

\* \* \* \* \* \*

"The conspiracy charged in this indictment is what? Not the sinking; not the participation, not those gory details, and so on, by Motto Franicevich. Absolutely not. He never was there, as you have heard so often during this trial.

"His first appearance on the scene is July 14, Monday morning, 1969, after all of these acts occurred—after the boat was sunk and after these engines were stolen. Please keep that in mind, ladies and gentlemen of the jury, when you begin deliberating on the evidence in this case. The first time we hear Motto Franicevich's name mentioned is after all the action took place."

(App. 215–216.)

The record discloses no reversible error. The judgment is therefore

Affirmed.