UNITED STATES v. CARDISH et al.

(District Court, E. D. Wisconsin. April 3, 1906.)

1. INDICTMENT—FEDERAL STATUTE—JOINDER OF COUNTS—ARSON.
   Under Rev. St. § 1024 [U. S. Comp. St. 1901, p. 720], which provides that two or more charges for crimes or offenses of the same class may be joined in the same indictment in separate counts, two counts, each charging the same defendants with the burning of a different building, may be joined in an indictment for arson.
   [Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Indictment and Information, §§ 419, 420, 422.]

2. INDIANS—ARSON COMMITTED ON RESERVATION WITHIN A STATE.
   Act March 3, 1885, c. 341, § 9, 23 Stat. 385, which provides that all Indians committing any one of certain enumerated crimes against the person or property of another Indian or other person within the boundaries of any state and within the limits of any Indian reservation shall be subject to the same laws and penalties "as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States," by implication repeals Rev. St. § 2143, in so far as that section makes a distinction between white persons and Indians in respect to the crime of arson committed in the Indian country, and under the later statute the crime and the punishment are the same whether committed by a white person or an Indian, or against a white person or an Indian.

3. ARSON—DWELLING HOUSE—SCHOOL BUILDING.
   A school building, one part of which is occupied as a habitation, with interior communication between the parts, is a dwelling house," within the meaning of the term as used in the law of arson.
   [Ed. Note.—For cases in point, see vol. 4, Cent. Dig. Arson, §§ 8, 13.]

4. SAME—INDICTMENT—DESCRIPTION OF BUILDING.
   An indictment for arson by the burning of "a certain dwelling house of the United States of America there situate, such dwelling house being then and there known as the 'Girls' Building of the Menominee Indian Training School,' and then and there occupied and used as such dwelling

house of the United States of America by the teachers of the said United States in the Indian service, and by other persons, such teachers and other persons being to the grand jury unknown," is sufficient in its description of the building and of the persons occupying the same, and shows, within the fair intendment of the law, that the building was not the habitation of defendants.

[Ed. Note.—For cases in point, see vol. 4, Cent. Dig. Arson, § 41.]

On Motion to Quash Indictment.
See 143 Fed. 640.

H. K. Butterfield, U. S. Dist. Atty.
Eberlein & Eberlein, for defendants.

QUARLES, District Judge. This is a motion to quash the second indictment found against the defendants for burning the Indian Training School on the Menominee Reservation. A former indictment, based upon the same transaction, was held bad on demurrer. All the counts of this indictment are nolled except the second and fourth. The second count is in the words and figures following, to wit:

"That Louisa La Motte and Lizzie Cardish are Indians, and were on the 17th day of January, A. D., 1905, each Indians, to wit, Menominee Indians, members of the Menominee Indian tribe, a tribe of Indians occupying a reservation within the boundaries of the state of Wisconsin called the 'Menominee Indian Reservation,' theretofore set apart by the United States as an Indian reservation for the use of said Menominee Indian tribe, and then so occupied by said tribe, and that the said Louisa La Motte and Lizzie Cardish, on the 17th day of January, A. D. 1905, in the daytime of said day, they then and there each being such Indians, as aforesaid, namely, a member of the said Menominee tribe, did, within the boundaries of a state of the United States, to wit, the state of Wisconsin, a certain dwelling house of the United States of America there situate, such dwelling house being then and there known as the 'Girls' Building of the Menominee Indian Training School,' and then and there occupied and used as such dwelling house of the United States of America by teachers of the said United States in the Indian service, and by other persons, such teachers and other persons being to the grand jury unknown, feloniously, willfully, and maliciously did set fire to, and the said dwelling house then and there, by said firing, as aforesaid, feloniously, willfully, and maliciously did burn and destroy, wherefore the grand jurors aforesaid, upon their oath aforesaid, do say: That the said Louisa La Motte and Lizzie Cardish, they each being then and there such Indians, as aforesaid, did, on the 17th day of January, A. D. 1905, commit the crime of arson against the property of another, to wit, of the United States of America, within the boundaries of a state of the United States, and within the limits of an Indian reservation, as aforedescribed, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States of America."

The fourth count is identical with the second, except that it charges the burning of the "Boys' Building" instead of the "Girls' Building."

The first objection made to the indictment is that it charges two separate, distinct felonies, one involving the burning of the Girls' Building of the Menominee Indian Training School, etc., while the other charges the burning of another building, known as the "Boys' Building." The relative situation or location of these two buildings is not set out. For aught that appears in the indictment, they may have been a mile apart. Therefore, for the purposes of the motion, it must be conceded that two distinct crimes are charged. The two offenses, however, are of the

same nature, and punishable by the same penalties. The objection does not furnish ground for a demurrer. The remedy of the accused is by motion to compel the government to elect. Section 1024 Rev. St. [U. S. Comp. St. 1901, p. 720]; Pointer v. United States, 151 U. S. 396, 400, 14 Sup. Ct. 410, 38 L. Ed. 208; Ingraham v. U. S., 155 U. S. 434, 15 Sup. Ct. 148, 39 L. Ed. 213; Crain v. U. S., 162 U. S. 625, 16 Sup. Ct. 952, 40 L. Ed. 1097.

The second objection is more serious. It involves the construction of section 9 of the act of March 3, 1885 (chapter 341, 23 Stat. 385), which reads as follows:

"That immediately upon and after the date of the passage of this act all Indians, committing against the person or property of another Indian or other person any of the following crimes, namely, murder, manslaughter, rape, assault with intent to kill, arson, burglary, and larceny within any territory of the United States, and either within or without the Indian reservation, shall be subject therefor to the laws of such territory relating to said crimes, and shall be tried therefor in the same courts and in the same manner and shall be subject to the same penalties as are all other persons charged with the commission of said crimes respectively; and the said courts are hereby given jurisdiction in all such cases; and all such Indians committing any of the above crimes against the person or property of another Indian or other person within the boundaries of any state of the United States, and within the limits of any Indian reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States."

It is contended that the above section, containing no repealing clause, did not work a repeal of section 2143, Rev. St., passed in 1854, which reads as follows:

"Every white person who shall set fire, or attempt to set fire to any house, out-house, cabin, stable or other building in the Indian country, to whomsoever belonging; and every Indian who shall set fire to any house, out-house, cabin, stable or other building in the Indian country, in whole or in part belonging to or in lawful possession of a white person, and whether the same be consumed or not, shall be punishable by imprisonment at hard labor for not more than twenty-one years, nor less than two years."

It may be conceded that, if section 2143 remains in force and is the law of this case, the indictment is fatally defective, because it does not indicate whether the occupants of the building at the time of the alleged burning were white people or Indians.

It is argued with great vigor that repeals by implication are not favored in the law, and many authorities to that effect have been cited. While the general principle is undoubtedly correct, the law is well settled that a repealing clause is not necessary to do away with the preexisting statute, if the purpose of Congress to that effect is clearly indicated; and this may be done in a variety of ways.

In Henderson's Tobacco, 11 Wall. (U. S.) 652, 657, 20 L. Ed. 235, the court say:

"Statutes are indeed sometimes held to be repealed by subsequent enactments, though the latter contain no repealing clause. This is always the rule when the provisions of the latter acts are repugnant to those of the former, so far as they are repugnant. The enactment of provisions inconsistent with those previously existing manifests a clear intent to abolish the old law."

In United States v. Tynen, 11 Wall (U. S.) 92, 20 L. Ed. 153, the court say:

"When there are two acts on the same subject, the rule is to give effect to both, if possible. But, if the two are repugnant in any of their provisions, the latter act, without any repealing clause, operates to the extent of the repugnancy as a repeal of the first; and even where two acts are not, in express terms, repugnant, yet, if the latter act covers the whole subject of the first, and embraces new provisions, plainly showing that it was intended as a substitute for the first act, it will operate as a repeal of that act."

See, also, Ward v. Race Horse, 163 U. S. 504, 514, 16 Sup. Ct. 1076, 41 L. Ed. 244.

It is matter of common knowledge that for many years, and, indeed, until within a very recent period, it was the policy of the government to deal with an Indian tribe as though it were another nation or people. Hundreds of treaties were made by the government with these tribes, whereby the tribal relation and authority were expressly recognized. At the same time, they were treated as the wards of the government, and a practical bonus was paid upon idleness by the largesses that were from time to time conferred upon them. It took 100 years of experience to demonstrate a proposition, which, stated in the abstract, appears self-evident, namely: that it is impossible to civilize a tribe as such; that civilization, like education or religion, must necessarily deal with the individual. It was finally found that the treatment by the government of its Indian wards had been unsuccessful and unscientific. Then appeared the dawn of a new and more enlightened policy, which contemplated breaking up the reservations, disintegrating the tribes, allotting lands in severalty, conferring the rights of citizenship, and individualizing the Indian, giving him the same rights, privileges, and immunities of citizenship, offering him the same inducements for industry, and, in short, dealing with the red man as we deal with other nationalities, by putting them on a common level of citizenship and opportunity, and leave each man to work out his own salvation. This change of policy may be noted in the legislation of Congress. In 1871 an act was passed, which now stands as section 2079, Rev. St., whereby, in substance, it is provided that thereafter no Indian nation or tribe within the United States shall be acknowledged or recognized as a nation, tribe, or power, with whom the United States may contract by treaty, etc. By another act (February 8, 1887, c. 119, 24 Stat. 390) any Indian who adapts the habits of civilized life may become a full citizen.

It was provided by the act of February 8, 1887 (chapter 119, 24 Stat. 388), that:

"Each and every member of the respective bands or tribes to whom allotments have been made shall have the benefit of and be subject to the laws both civil and criminal of the state or territory in which they may reside."

This legislation marks a new era in our Indian policy, and the section we are considering (section 9 of the act of March 3, 1885, c. 341, 23 Stat. 385) is an essential part of this new scheme; for, as we read it, it is intended to make the Indian upon the reservation amenable to the same laws and punishments as to the crimes enumerated therein

as any white man or other person in any place which is within the exclusive jurisdiction of the United States.

Let us now turn to section 2143. We find that it embodies the tendencies of the discarded system, and it recognizes the distinction between the white man and the Indian. The same characteristics are noted in section 2142, while 2142 extends the laws of the United States for forgery and depredation upon the mails over the Indian country. By section 2145, as to all crimes not specially mentioned in that title, the general laws of the United States in force in all places within the sole and exclusive jurisdiction of the United States are extended over the Indian country, except as to a crime committed by one Indian against another; so that, if arson had not been specifically provided for in the above title, it would, by virtue of section 2145, have been made punishable under section 5385 [U. S. Comp. St. 1901, p. 3648], which expressly punishes arson in forts and other places within the exclusive jurisdiction of the United States. Even these earlier enactments manifest the purpose of Congress to gradually extend over reservations the Penal Code as administered where the government has exclusive jurisdiction; but the section under consideration was a long step in that direction. Among other things, it eradicates, so far as the enumerated crimes are concerned, the jurisdiction, so long exercised by the tribes, over all crimes committed by an Indian against the person or property of another Indian.

Read in the light of these facts, it seems clear that the act of 1885 was intended to bring the crimes therein mentioned, when committed by an Indian upon a reservation within a state, within the punishment laid down for the same crime when committed by a white person within a fort, arsenal, or other place exclusively within the jurisdiction of the United States; in other words, the whole subject-matter of section 2143, so far as it relates to a crime by an Indian, is covered by the later enactment, which is clearly repugnant to it, because the circumstance of color and race have been thereby eliminated as ingredients, and the United States has for the first time assumed to punish Indians resident upon reservations within a state. This view has been adopted by the Supreme Court in United States v. Kagama, 118 U. S. 375, 383, 6 Sup. Ct. 1109, 30 L. Ed. 228. The court treats this act of 1885 as a new departure in legislation, which tends to sweep away the old system and the old distinctions. See, also, Draper v. United States, 164 U. S. 240, 241, 17 Sup. Ct. 107, 41 L. Ed. 419.

For this reason, I must hold that section 2143, Rev. St., was by necessary implication repealed by the act of 1885, so far as it is repugnant to the later act.

Third. It is contended that the indictment is fatally defective in its description of the building burned and of the persons whose habitation it was. The indictment says:

"A certain dwelling house of the United States of America there situate, such dwelling house being then and there known as the 'Girls' Building of the Menominee Indian Training School,' and then and there occupied and used as such dwelling house of the United States of America by the teachers of the said United States in the Indian service, and by other persons, such teachers and other persons being to the grand jury unknown."

It is claimed that a schoolhouse is not a house or dwelling at the common law. Stated broadly, this is true. But it was well settled at the common law that a building, to constitute a dwelling house, need no be used exclusively for that purpose. If one part of the building is used as a habitation, it gives the character of a dwelling house to the entire building, if there be an internal communication between the two. Rex v. Stock, Rus. & Ry. 138, also reported in 2 Taunt. 339, is a leading case in England as to what constitutes a dwelling house. The offense there charged was burglary, but as to the definition of the above term, it is equally applicable. The indictment charged the offense to have been committed in the dwelling house of three copartners, naming them. The evidence showed that the lower rooms were occupied by the partners as a banking house, and no one slept on the first floor. The upper rooms were occupied by John Stevenson, who was a servant of the prosecutors, and engaged in their business at weekly wages, with lodging for himself and family. The rooms that he thus occupied had a separate entrance from the outside. The only communication between these upper rooms and the lower floor was a trapdoor and ladder. The defendant having been convicted, the question reserved for the judges was, first, whether this inhabitancy could be considered as the inhabitancy of the prosecutors by their servant, and, second, if yea, whether there was such a severance of the lower part as to prevent it being included as a part of their dwelling. The conviction was unanimously affirmed. See, also, Rex v. Smith, 2 East. P. C. 497. A jail has been held to be a house, within the meaning of the law of arson, when the jailor lives therein with his family. People v. Van Blarcum, 2 Johns. (N. Y.) 105. In King v. Dunnevan, 1 Leach, Cr. Law, 81, the prisoner was indicted for setting fire to the common jail. It was laid in the first count as "the house of the corporation of Liverpool, called the 'common jail' "; second, of the "mayor and bailiffs of Liverpool, called the 'common jail' "; third, of Anna Hornby; fourth of Richard Rigby. It appeared in evidence that the jail belonged to the corporation of Liverpool; that Rigby was the keeper; that the keeper's dwelling house adjoined thereto, wherein Rigby lived; and that Hannah Hornby lived with him. Gould, J., who tried the case, reserved it for all the judges, who were of the opinion that this case was fully within the act (9 Geo. I, c. 22); the dwelling house being considered as part of the prison, and the whole prison being the house of the corporation. This statute of Geo. I was held not to change the old common law, or to create any new offense. King v. Spaulding, 1 Leach, 258. In McLane v. State, 4 Ga. 338, in the indictment the building was described as "a house used as a dwelling house, the property of Moses Harshaw, in the county of Habusham." Indictment held good by the Supreme Court.

There is a quaint old case decided by the Court of Appeals of Virginia in 1787 (Commonwealth v. Posey, 4 Call. [Va.] 109, 2 Am. Dec. 560). It concerned a common-law indictment for arson, which charged in separate counts the felonious burning of two separate buildings; one laid as "the house of William Clayton" in a certain parish, the other described as "the common jail and county prison of the

county of Kent." Objections were made that neither building was described with sufficient certainty. Each one of the nine judges rendered a separate opinion. It was held that the indictment was sufficient; that "the house of William Clayton" meant the house belonging to William Clayton, and that "house" as there employed meant "dwelling house"; that the allegation regarding the jail was sufficient, because it clearly designated the building, and that the prison was a dwelling house in contemplation of law, because it was the abode of persons confined under legal process. Only one of the nine judges dissented.

The strictness of the common-law rules of pleading in criminal cases, like every other rule of the common law, is bottomed on reason. They are not arbitrary or subtle when clearly understood. Lord Coke used to say that "he is ignorant of the law who knoweth not the reason thereof." The obvious reasons underlying these strict requirements in defining the dwelling house in an indictment for arson are twofold, and both intended for the better protection of the accused—first, to enable him to prepare his defense intelligently; second, to protect him in case of a verdict either way from a second prosecution for the same offense. For these reasons, ambiguous or imperfect description of the building burned will not be tolerated.

The practical test, therefore, in this case is whether this particular building has been so described as to clearly identify it, so that the defendants may know with certainty what particular building they are charged with burning, and so that no mistake or confusion can afterwards arise out of which might spring a second accusation for the same offense. In an ordinary case the building would simply be designated in an indictment as the dwelling house or A. B., in possession of C. D., in such a county or district. No exact location or further description of the building would be required. But in the indictment in question the description is definite as to ownership, particular as to nature and situation, so that the identity of the building for all purposes is put beyond doubt.

But it is alleged that the essence of the common-law crime of arson is the burning of the building of another, and that this indictment is faultly in not specifying by name the persons who were then occupying and dwelling in the building. It is claimed that in no other way can the strict rule of the common law be met, and only thus can it be made to appear that the building was not in the occupancy of the accused. It is argued that, if the persons who occupied the building were "to the grand jury unknown," it might well be that they were the accused. At the bottom of this rule lies the simple proposition that at the common law a man was not guilty of arson who burned his own house while he occupied the same. The indictment, therefore, must in some way negative that proposition, not by any prescribed formula of words, but sufficiently to show that the building burned was not that of the defendants. I find an early authority which sanctions the very form employed in this indictment in Rex v. Rickman, 2 East. P. C. 1034, where a parish pauper set fire to a house in which he was put to reside by the overseers, and it was not known who the trustees were in whom

the legal ownership was vested.    It was held that it might be described as "the house of the overseer, or of persons unknown."

I think that the averments of the indictment are sufficient to indicate that the building was the habitation of another, within the fair intendment of the law.

For these reasons, the motion to quash must be denied.