**MARCHESE et al. v. UNITED STATES, and five other cases.**

Nos. 9935, 9936, 9956, 10010, 10025, 10026.

Circuit Court of Appeals, Fifth Circuit.

March 9, 1942.

As Modified on Denial of Rehearing April 11, 1942.

In Nos. 9935 and 9936:

Homer L. Loomis, of New York City, for appellants.

Herbert S. Phillips, U. S. Atty., of Tampa, Fla., and Wm. A. Paisley, Asst. U. S. Atty., of Jacksonville, Fla., for appellee.

In No. 9956:

Homer L. Loomis, of New York City, and Joseph M. Oliver, of Savannah, Ga., for appellants.

J. Saxton Daniel, U. S. Atty., and G. B. Everitt, Asst. U. S. Atty., both of Savannah, Ga., for appellee.

In No. 10010:

Homer L. Loomis, of New York City, for appellants.

Douglas W. McGregor, U. S. Atty., and Newton M. Crain, Jr., Asst. U. S. Atty., both of Houston, Tex., for appellee.

In Nos. 10025 and 10026:

Homer L. Loomis, of New York City, and Hugh M. Wilkinson and John D. Lambert, both of New Orleans, La., for appellants.

J. Skelly Wright and Robert Weinstein, Asst. U. S. Attys., both of New Orleans, La., for appellee.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

These six appeals are similar in their facts, involve the same questions of law, and have been argued together. In each case the officers and crew of a vessel of Italian registry which had been tied up in a port of the United States damaged her machinery and navigation equipment so as to render her incapable of use, but without harming her hull or rendering it dangerous for them to remain aboard her. This was done during the last days of March, 1941, by direction of the naval attaché of the Italian embassy at Washington, after war broke out between Italy and France, and for the purpose of so disabling the ships as to render them useless to an enemy of Italy. The owners, in most cases, had directed the ships' officers in case of war to obey instructions from the naval attaché. The officers and crew members were indicted for conspiracy to violate, and for violating, Title III of the Act of June 15, 1917, 40 Stat. 217, 221, which appears as Section 502 of Title 18 U.S.C.A. There were acquittals of conspiracy in some cases, but convictions of the substantive offenses charged in every case. It is not denied that the acts charged were done, but the defense is that the statute does not apply to them, or if it does there was not the intent defined by the statute, and that the shipowners directed what was done. These contentions arose on demurrers to the indictments, motions for directed acquittals, and on requests for and objections to charges to the jury.

The history and meaning of the Act of June 15, 1917, have been ably discussed in similar cases by Judge Parker in Bersio et al. v. United States, 4 Cir., 124 F.2d 310; by Judge Paul in United States v. Saglietto, D.C., 41 F.Supp. 21; by Judge Goodrich in United States v. Tomicich, D.C., 41 F.Supp. 33; by Judge Chesnut in United States v. Pierraccini,[1] and by Judge McDuffie in United States v. Martini, D. C., 42 F.Supp. 502; with contradictory conclusions. We deem it expedient to set forth our views without particular comparison with those therein expressed.

We think Title II and Title III of the Act, 50 U.S.C.A. §§ 191–194 and 18 U.S.C.A. § 502 are independent. As Judge McDuffie points out, they arose as separate bills in the Senate. Section 3 of Title II[2] penalizes the wilful causing or permitting by an owner, master or member of a crew of a vessel, foreign or domestic, of the injury or destruction of the vessel, or permitting its use for named purposes; but the preceding and following sections show that Title II is applicable only after a proclamation of national emergency, and no proclamation is alleged or had in fact been made in March, 1941.[3] Section 4, 50

---

[1] No opinion for publication.

[2] 50 U.S.C.A. § 193.

[3] Except as the proclamation of limited emergency of September 8, 1939, 54 Stats.

U.S.C.A. § 194 declares that the President may employ the land and naval forces to carry out the purpose of the Title, indicating that emergency pervades the whole Title. Therefore the whole of Title II was properly placed in Title 50 of the United States Code Annotated, along with our other war legislation, rather than in Title 18, where ordinary crimes are treated.

■ Title III of the Act, 18 U.S.C.A. § 502 is applicable in peace time as an ordinary criminal statute. Its meaning ought justly to be gathered from its words as promulgated to the public rather than from the expressions of legislators or even of their committees pending its passage. And a real doubt as to the meaning of the law ought to be given in favor of the accused, just as a real doubt as to his acts or intent ought to be. Title III consists of a single long sentence, quoted in the margin;[4] which can be simplified for present purposes by reducing it to the words here applicable: "Whoever shall set fire to any vessel of foreign registry * * * or shall tamper with the motive power or instrumentalities of navigation of such vessel, or shall place bombs or explosives in or upon such vessel, or shall do any other act to or upon such vessel while within the jurisdiction of the United States * * * with intent to injure or endanger the safety of the vessel or of her cargo, or of persons on board * * * ; or whoever shall attempt or conspire to do any such acts with such intent, shall be fined," etc.[5] All the acts named, whether done or attempted or conspired about, must be with "intent to injure or endanger the safety of the vessel, or of her cargo, or of persons on board." There is in this specification of intent plainly an ellipsis, words left out, to be supplied from the context. The word "injure" is a transitive verb, requiring an object, but none immediately follows it. Is its object to be taken to be the noun "safety" in the phrase "endanger the safety", or are the nouns "vessel", "cargo" and "persons" the objects meant? "Endanger the safety" is a common expression to signify jeopardy without actual injury inflicted. "Injure the safety" is a most unusual expression, injury being commonly affirmed as done to a person or a concrete thing. We think the natural meaning fully expressed is this: "With intent to injure the vessel, her cargo, or persons on board, or to endanger the safety of the vessel, or of her cargo, or of persons on board." If in interpreting a criminal statute we may regard its legislative evolution, we will find confirmation of this interpretation. Title III originated as a separate bill, Senate Bill No. 6793, and was entitled: "A bill to prevent and punish wilful injury, or attempted injury to, or conspiracy to injure, any vessel engaged in foreign commerce, or the cargo or persons on board thereof, by fire, explosion, or otherwise." The main purpose as expressed in this title was to deal with actual injury to the vessel, its cargo, or persons on her. The phrase "or endanger the safety of" seems to have been inserted in the body to cover cases where no specific injury was done or intended, but only a dangerous condition created. It was

---

2643, and the enlargement of it on June 27, 1940, 54 Stats. 2711, put into some effect Sect. 1 of Title II.

4 "Title III.

"Injuring Vessels Engaged in Foreign Commerce.

"Section 1. Whoever shall set fire to any vessel of foreign registry, or any vessel of American registry entitled to engage in commerce with foreign nations, or to any vessel of the United States as defined in section three hundred and ten of the Act of March fourth, nineteen hundred and nine, entitled 'An Act to codify, revise, and amend the penal laws of the United States,' or to the cargo of the same, or shall tamper with the motive power or instrumentalities of navigation of such vessel, or shall place bombs or explosives in or upon such vessel, or shall do any other act to or upon such vessel while within the jurisdiction of the United States, or, if such vessel is of American registry, while she is on the high sea, with intent to injure or endanger the safety of the vessel or of her cargo, or of persons on board, whether the injury or danger is so intended to take place within the jurisdiction of the United States, or after the vessel shall have departed therefrom; or whoever shall attempt or conspire to do any such acts with such intent, shall be fined not more than $10,000 or imprisoned not more than twenty years, or both."

5 The maximum imprisonment is twenty years, much higher than that fixed in Title II. Only the ship is involved in Title II. Human life may be involved under Title III, justifying a higher maximum. The sentences imposed in the cases under review range from a few months' imprisonment to four years, the ships only having been injured, or intended to be injured.

added not to restrict but to broaden the application of the Act; and actual injury to the vessel, cargo, or persons on her was not thereby put out of the scope of the Act.

 That the owners of these ships through the naval attaché consented to the acts of injury is not a defense. It is. true as argued that common law offenses against private property such as burglary, larceny, arson, and malicious mischief, did not apply to an owner dealing with his own property; and that many statutes made to protect private property have similarly been held not to apply to the owners.[6] But a legislature can prevent destruction of private property by its owner, or its injury, when the public interests are concerned. Thus fish and game can be protected against unreasonable killing on one's own land, though he has a right to take them appurtenant to his land; and conservation statutes may protect forests, oil and coal deposits, and other things important to the public welfare, against improvident or wasteful consumption by their owners. Statutes can be made whereby any private property can be taken for public use, just compensation being paid, and the needed property can be protected until it is taken. The statute before us was not made to protect shipowners against the acts of others, but to protect the public interest in ships as vehicles of foreign commerce, with their cargoes and persons on board, against injury or danger by the acts of any person, whether owner, crew, or outsider. It would be an absurd construction to say that an owner may do some of the things prohibited, such as placing a bomb on the vessel, or setting a fire, with intent to injure either persons on board or the cargo. Congress has under the Constitution full authority to protect and foster foreign commerce, and this includes protection of its instrumentalities, most important among which are vessels. The title of the whole Act states as one of its purposes "To punish acts of interference with * * * the foreign commerce of the United States." Title III is headed "Injuring vessels engaged in foreign commerce." The interests of foreign commerce, and not of the owners of ships, are here the object of congressional solicitude. Cargo and passengers on board

are commerce. Vessels are instruments of commerce. All are protected by the statute against the acts of everyone. The word "Whoever", with which the Title opens, is the most comprehensive designation of persons in our language. Title III still has the heading "Injuring Vessels engaged in Foreign Commerce."

 It is thereupon argued that only ships which at the time of injury are actively engaged in commerce are meant by the Act, and not those tied up at the wharf indefinitely, as these were. While the title of the Act speaks of foreign commerce, and the heading of Title III speaks of "Vessels engaged in foreign commerce," the effective language of the body of this Title is, "Vessel of foreign registry" and "Vessel of American registry entitled, to engage in commerce with foreign nations." There is no uncertainty or ambiguity about these expressions in the body of the Act, and the language of the title or heading does not limit them. Vessels of foreign registry in American ports and vessels of American registry entitled to engage in foreign commerce, though not at the moment active in such commerce, are available for such use. The United States may even take them over to compel their use.. Congress may protect them. The vessels here involved were tied up only for an emergency which it was hoped would pass away. The ships had not by their owners been devoted to another use.

 Thus construing. the statute, we think the indictment in Ranise et al. v. United States, from. Texas, which alleged acts done with intent to injure the vessel, saying nothing about endangering her safety, was sufficient, and the charge of the court accordingly was correct. In the other indictments the full language of the statute as to intent was used, and was of course abundantly sufficient. The varying charges to the jury, if error, were error in favor of the defendants. In each case the acts charged were admitted to have been done, and with intent to render the vessel incapable of use in commerce. This was an injury to her as a vessel. It may be regrettable that absent owners who authorized the acts, and immune diplomatic

---

[6] Appellants cite: United States v. Cardish, D.C., 145 F. 242; Rex v. Spaulding, 1 Leach 218; Rex v. Breeme, 1 Leach 220; State v. Mason, 35 N.C. 341, 13 Ired.Law 341; State v. Jones, 129 N.C. 508, 39 S.E. 795; Martin v. Regina, 3 N. & P. 492; Rex v. Madox, Russ & Ry., 92; Commonwealth v. Hartnett, 3 Gray 450, 69 Mass. 450; United States v. Vanranst, 28 Fed.Cas. page 360, No. 16,608; United States v. Murphy, D.C., 50 F.2d 455.

persons who ordered them, are not the subjects of punishment, but only ship officers and crews who were doing what they were told to do, and probably thinking they were doing right. It does not, however, appear that anyone acted under such duress as to render him irresponsible to the criminal laws. All must, while they are in an American port, obey the laws of the United States made to regulate foreign commerce.

Finally, an attack is made upon the Act as in violation of the Fifth Amendment, because depriving the owners of their property without due process of law, and because no sufficiently clear standard of criminality is set forth. The Act is a reasonable preservation of property. It does not take it. It does limit an owner's right to injure or destroy his property, but since the limitation is made in the public interest there is no such arbitrariness as to constitute a want of due process. There is no failure, as respects appellants, in defining what they might not do. The Act prohibits "tampering with the motive power or instrumentalities of navigation of a vessel" with intent to injure her or endanger her safety. They did exactly that in each case. The law is plain enough.

The judgment in each case is affirmed.