**UNITED STATES OF AMERICA,
Plaintiff,**

v.

**Jay Scott BALLINGER, Defendant.**

**Nos. 2:99–CR–26–WCO,
2:01–CR–32–WCO.**

United States District Court,
N.D. Georgia,
Gainesville Division.

July 13, 2001.

Christopher Asher Wray, Assistant United States Attorney, Atlanta, Georgia, for plaintiff.

Paul Stephen Kish, Federal Defender Program, Atlanta, Georgia, for defendant.

## ORDER

O'KELLEY, Senior District Judge.

The instant case is presently before the court for consideration of defendant's objections [27–1; 33–1] to the magistrate judge's report and recommendation of February 20, 2001 [26–1] and his report and recommendation of April 13, 2001 [32–1]. Defendant requests that this court grant his motion to dismiss the charges against him for lack of jurisdiction.

### Background

As part of a widespread church arson campaign, defendant Jay Scott Ballinger, a self-proclaimed "missionary of Lucifer," deliberately set fire to five churches in the Northern and Middle Districts of Georgia between December 22, 1998 and January 16, 1999 [Stip. at 4]. Defendant's fires completely destroyed the Amazing Grace Baptist Church in Chatsworth, Georgia ("Amazing Grace"); the New Salem United Methodist Church in Commerce, Georgia ("New Salem"); and the fellowship hall of the Sardis Full Gospel Church in Monroe, Georgia ("Sardis Full Gospel") [31–1]. The New Salem fire resulted in the death of one volunteer firefighter and bodily injury to three other firefighters [31–1]. Defendant's two additional fires badly damaged the Johnson United Methodist Church in Watkinsville, Georgia ("Johnson United") and the fellowship hall of the

Mountain View Baptist Church in Chatsworth, Georgia ("Mountain View") [31–1].

In connection with these arsons, defendant pleaded guilty on April 13, 2001 to four counts of violating 18 U.S.C. § 247(a)(1) and (b), which proscribe "intentionally defac[ing], damag[ing], or destroy[ing] any religious real property, because of the religious character of that property," provided "that the offense is in or affects interstate or foreign commerce." 18 U.S.C. § 247(a)(1) & (b) (2001) [30–1]. Further, defendant pleaded guilty to one count of violating § 247(a)(1), (b), (d)(1) and (d)(2) [30–1]. *See* 18 U.S .C. § 247(a)(1), (b), (d)(1)–(2) (2001). Sections 247(d)(1) and (d)(2) provide for enhanced penalties under the statute "if death results from [the defendant's] acts," 18 U.S.C. § 247(d)(1) (2001), or "if bodily injury results to any person ... and the violation is by means of fire...." 18 U.S.C. § 247(d)(2) (2001).[1]

Pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, *see* Fed. R.Crim.P. 11(a)(2), however, defendant conditioned his April 13, 2001 guilty plea upon a judicial determination of the constitutionality of § 247, both on its face and as applied to him, under the Commerce Clause of the United States Constitution [31–1]. *See* U.S. Const. art. I, § 8, cl. 3. Defendant contends that although he committed these arsons, this court must dismiss the indictments against him because (A) there is an insufficient nexus between each of the burned churches and interstate commerce, such that defendant's offenses were not "in or affect[ing] interstate ... commerce," 18 U.S.C. § 247(b) [33–1]; or (B) section 247 regulates noneconomic intrastate criminal activity, rather than in-

terstate commercial activity, and therefore the statute is an unconstitutional exercise of Congress' power "[t]o regulate Commerce ... among the several States...." U .S. Const. art. I., § 8, cl. 3 [27–1].

For purposes of addressing defendant's constitutional challenges to § 247, the parties stipulated to the following additional facts [31–1]: Prior to its complete destruction, Amazing Grace had purchased song books from Knoxville, Tennessee; pew coverings and hymnals from Cleveland, Tennessee; and fund-raising supplies (candy) from Montgomery, Alabama. Its 300–member congregation, some of whom resided in neighboring Tennessee, had recently purchased the church building and one acre of land from the North Georgia Conference of the United Methodist Church, headquartered in Evanston, Illinois. To finance this acquisition and repair storm damage, the congregation held yard sales, bake sales, and sold cookbooks. The congregation commissioned the printing of these cookbooks in Collierville, Tennessee. Amazing Grace also collected donations for the poor, some of which were provided to needy travelers in the form of food, household items, and hotel or motel lodging.

Mountain View, a 372–member congregation, had acquired Bible school materials from California, building supplies from Alabama and other out-of-state vendors, and plumbing and electrical supplies from Collierville, Tennessee. The church belonged to the 14–member Coosawattee Baptist Association and donated money to the Georgia Baptist Children's Home, which provided housing, clothing, food, and classroom instruction to foreign children

---

1. The counts to which defendant pleaded guilty appeared in two separate indictments: Indictment No. 2:99–CR–026 [1–1] and Indictment No. 2:01–CR–032 [1–1] (Indictment No. 3–99–CR–10, transferred from the United

States District Court for the Middle District of Georgia pursuant to Rule 20 of the Federal Rules of Criminal Procedure. See Fed. R.Crim.P. 20).

intercepted by the U.S. Immigration and Naturalization Service, as well as children from other U.S. states. In 1998, Mountain View donated $1,536 in such funds. The church contributed an additional $1,536 to Georgia Baptist Hospital's indigent-care fund which, in part, provided medical services to children whom its doctors brought to Georgia from the Dominican Republic, Russia, and various South American countries. At the time of the fire, at least one of Mountain View's members was living out-of-state; this member was serving in the U.S. military but returned to the church when on leave. Mountain View also used a 15–passenger van shipped from Orlando, Florida to transport its youth choir and elderly women's groups.

Sardis Full Gospel, a 60–member congregation, regularly held week-long revivals, hosting visiting pastors from Canada, Florida, Mississippi, Ohio, and South Carolina. These out-of-state pastors would either stay with church members, in local hotels, or in the church itself, which was equipped with showers and sleeping facilities. Further, the congregation prepared and served meals to the visiting pastors in its fellowship hall, which defendant destroyed on December 25, 1998. The church had also acquired, via donation, a fax machine/copier from Panasonic, Inc., a donation that was specifically approved by the company's New Jersey headquarters.

Like Amazing Grace, New Salem was a member of the North Georgia Conference of the United Methodist Church, whose national headquarters were in Evanston, Illinois. Through this conference, New Salem, which had roughly 120 members at the time of its destruction, regularly sent money to the national office. The national office used these funds for a variety of purposes, including foreign and domestic missions. To subsidize its pastor's pension, New Salem also contributed, through the conference, to the Illinois-based pension administrator—United Methodist Church's General Board of Pension and Health Benefits. The church property itself was held in trust for the General Conference of the United Methodist Church in Illinois.

Prior to its destruction, New Salem had acquired office supplies from Ottawa, Illinois; Bible school materials from Grandview, Missouri; banners from Nashville, Tennessee; church bulletin and newsletter-making materials from Canton, Ohio; and a steeple from Alabama. The congregation had several out-of-state members and several out-of-state recipients of its monthly newsletters. To finance youth group trips and outings, including trips to Orlando, Florida and Chattanooga, Tennessee, New Salem members held fundraising barbeques, bake sales, and car washes and sold candy.

Johnson United, a 132–member congregation, also belonged to the North Georgia Conference of the Evanston, Illinois-based United Methodist Church, to which it regularly sent monetary apportionments. Like New Salem, Johnson United subsidized its pastor's pension plan and health insurance by contributing, through the conference, to the United Methodist Church's General Board of Pension and Health Benefits. The church property itself was held in trust for the General Conference of the United Methodist Church in Illinois, and several of Johnson United's members lived in other states, including Illinois, yet continued to attend services. Additionally, the congregation purchased Sunday school and Bible school materials from Nashville, Tennessee; Boy Scout and Girl Scout troops used the church for meetings; and the church also served as a voting precinct for citizens in its district.

All five of the damaged or destroyed churches received annual visits from the Nashville, Tennessee-based Gideon Bible

Ministry, which conducted worship services and collected monetary donations used for placing Bibles throughout the United States and in 175 different countries. Further, all five of the churches purchased all of their propane gas from out-of-state suppliers, though local services delivered it. Mountain View was also insured by an out-of-state carrier, Church Mutual Insurance Company of Wisconsin.

To commit the aforementioned arsons, defendant and his girlfriend, Angela Wood ("Wood"), drove from Indiana to Georgia via interstate highways in defendant's Indiana-registered Ford Aerostar van. While en route to Georgia, defendant and Wood spent the night in hotels, purchased gasoline and other supplies, and intentionally set fire to three churches between December 20 and December 22, 1998; the Mt. Eden Christian Church in Scottsburg, Indiana; the Bolton Schoolhouse Missionary Baptist Church in Bonnieville, Kentucky; and the Little Hurricane Primitive Baptist Church in Manchester, Tennessee. Once in Georgia, where they stayed from December 22, 1998 until January 16, 1999, defendant and Wood purchased a plastic gasoline container from K–Mart using defendant's Indiana VISA card and, on separate occasions, set fire to each church at issue by breaking a ground-level or low-level window, pouring gasoline through the broken window, and then igniting it. From December 22 until December 26, 1998, defendant and Wood stayed overnight at the Best Inns of America in Dalton, Georgia. From December 26, 1998 until January 16, 1999, defendant and Wood stayed overnight at the Perimeter Inn in Athens, Georgia.

Following their Georgia arson spree, defendant and Wood drove back to Indiana via interstate highways, purchasing gasoline and other supplies, staying in hotels, and deliberately setting fire to three additional churches along the way: the Cedar Grove Baptist Church in Franklin, Kentucky; the Pleasant Hill Methodist Church in Elkton, Kentucky; and the New Harmony Baptist Church in Beaver Dam, Kentucky.

## Discussion

Rule 11(a)(2) of the Federal Rules of Criminal Procedure provides:

> Conditional Pleas. With the approval of the court and the consent of the government, a defendant may enter a conditional plea of guilty ... reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any specified pro-trial motion. A defendant who prevails on appeal shall be allowed to withdraw his plea.

Fed.R.Crim.P. 11(a)(2). Upon entering his conditional guilty plea before the magistrate judge on April 13, 2001, defendant obtained the express written consent of the government, pursuant to Rule 11(a)(2) [31–1]. *See also United States v. Pierre,* 120 F.3d 1153, 1155–56 (11th Cir.1997) (discussing the requirements of a conditional plea pursuant to Rule 11(a)(2)). Further, defendant and the government set forth, in writing, the specific issue upon which defendant conditioned his plea: "the constitutionality of 18 U.S.C. § 247 under the Commerce Clause ... both on its face and as applied to him based on the stipulated factual basis attached [t]hereto and made a part of the Plea Agreement" [Guilty Plea & Plea Agmt. at 2]. Defendant and the government also preserved their right to appeal the determination of this issue, not only before a panel of the United States Court of Appeals for the Eleventh Circuit but also before that court sitting *en banc,* and on a petition for *certiorari* to the Supreme Court of the United States [31–1]. Having thus established defendant's factual guilt, this court need only address defendant's contentions as to the constitutional validity of § 247.

**1366**

## A. Defendant's As–Applied Challenge to § 247

Defendant contends that under *Jones v. United States*, 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000), and its progeny, *see, e.g., United States v. Odom*, 252 F.3d 1289 (11th Cir.2001); *United States v. Johnson*, 246 F.3d 749 (5th Cir.2001); *United States v. Ramey*, 217 F.3d 842, 2000 WL 790959 (4th Cir. June 20, 2000); *United States v. Rea*, 223 F.3d 741 (8th Cir.2000), this prosecution cannot withstand constitutional scrutiny because each of the churches at issue lacks a sufficient jurisdictional nexus to interstate commerce [33–1]. In other words, defendant argues that the federal church arson statute, 18 U.S.C. § 247, does not reach his conduct because the crimes he committed were not "in or affect[ing] interstate ... commerce." 18 U.S.C. § 247(b).

Yet, defendant relies upon cases construing the jurisdictional element of an entirely different statute: the general federal arson statute, 18 U.S.C. § 844(i). *See Jones*, 529 U.S. at 850, 120 S.Ct. 1904; *Odom*, 252 F.3d 1289, 1291; *Johnson*, 246 F.3d at 751–52; *Ramey*, 2000 WL 790959, *1; *Rea*, 223 F.3d at 743. In a § 844(i) prosecution, the United States cannot assert jurisdiction without proving that the property at issue was either *"used* in interstate ... commerce;" or *"used* ... in any activity affecting" interstate commerce. 18 U.S.C. § 844(i) (2001) (emphases added). It is true, therefore, that a church's "purchase and receipt of goods or services necessary for or common to the maintenance of any building, such as gas, electricity, insurance, or mortgage loans," do not furnish the requisite connection to interstate commerce to meet the "use" element of § 844(i). *Odom*, 252 F.3d 1289, 1291

(citing *Jones*, 529 U.S. at 856–57, 120 S.Ct. 1904). Nor can a church's receipt of donations from out-of-state benefactors, purchase of a nominal amount of Bibles and prayer materials from out-of-state sources, or membership in an intrastate church organization that pays dues to a national organization, such as the National Baptist Convention, satisfy the requirement under § 844(i) that the church be actively engaged in interstate commerce. *See id.* at 1293 ("These 'connections' to interstate commerce are too passive, too minimal and too indirect to substantially affect interstate commerce.").

By contrast, § 247, as amended by The Church Arson Prevention Act of 1996, Pub.L. 104–155 (1996), contains no such "active use" requirement; it confers federal jurisdiction on a mere showing by the government that "the offense is *in* or *affects* interstate or foreign commerce." 18 U.S.C. § 247(b) (emphases added). The Supreme Court observed in *Jones* that this "affecting commerce" language, "when unqualified, signal[s] Congress' intent to invoke its full authority under the Commerce Clause." 529 U.S. at 854, 120 S.Ct. 1904. Similarly, the Tenth Circuit, the only federal appeals court to have addressed the jurisdictional scope of § 247, recently opined that the 1996 amendments to § 247, *see* The Church Arson Prevention Act § 3(3), were "intended by Congress 'to exercise the fullest reach of the Federal commerce power' by eliminating previously existing jurisdictional obstacles, including a minimum dollar amount of loss, and broadening the reach of the statute." *United States v. Grassie*, 237 F.3d 1199, 1209 (10th Cir.2001) (quoting 142 Cong. Rec. S7908–04 (daily ed. July 16, 1996) (Joint Statement of Floor Managers Regarding H.R.3525, The Church Arson Prevention Act of 1996)).[2]

**2.** The prior version of § 247 required that "(1) in committing the offense, the defendant

travels in interstate or foreign commerce, or uses a facility or instrumentality of interstate.

Applying this reasoning, the Tenth Circuit rejected a defendant's constitutional attack on his § 247 conviction even though, at trial, the district judge instructed the jury that only a *de minimis* effect on interstate commerce need be proved to satisfy the jurisdictional element of the offense.[3] *See id.* at 1208–09. Grassie, like the defendant in the instant case, had unsuccessfully argued that *Jones* mandated a reversal of his conviction because the churches he damaged could not satisfy the "active use" requirement under § 844(i). *See id.* This court need not decide whether a *de minimis* effect rule is appropriate for § 247 convictions. Nevertheless, it is important to note that the 1996 amendments to § 247 were an explicit attempt by Congress to expand federal jurisdiction over church arsons. *See id.* at 1209. Further, in requiring that the property at issue be actively engaged in interstate commerce to satisfy the jurisdictional element of § 844(i), the *Jones* court observed that "Congress did not define the crime described in § 844(i) as the explosion of a building whose damage or destruction might affect interstate commerce...." 529 U.S. at 854, 120 S.Ct. 1904. *See also Rea,* 223 F.3d at 743 ("While the destruction of a building might affect interstate commerce, the building itself must have been used in commerce ... to meet the requirements of § 844(i)."). Here, however, Congress *has* defined such a crime; the jurisdictional element of § 247 is satisfied where "the offense" (e.g., the destruction of religious property) "is in or affects" (e.g., occurs in or impacts) interstate commerce. 18 U.S.C. § 247(b). The Supreme Court thus appears to have envisioned in *Jones* the very scenario presented in this

case and approved, albeit inferentially, a nominal jurisdictional nexus requirement under § 247. *See* 529 U.S. at 854, 120 S.Ct. 1904. Lastly, the Eleventh Circuit approved similar jurisdictional language in the face of a post-*Lopez* constitutional challenge to 18 U.S.C. § 922(g), which makes it a crime for any convicted felon to "possess [any firearm or ammunition] *in* or *affecting* commerce." *United States v. McAllister,* 77 F.3d 387, 389–90 (11th Cir. 1996), *cert. denied,* 519 U.S. 905, 117 S.Ct. 262, 136 L.Ed.2d 187 (1996) (emphases added) (citing 18 U.S.C. § 922(g)).

The stipulated factual basis attached to defendant's plea agreement [31–1] convinces this court that each of the five Georgia churches defendant burned were sufficiently involved in interstate commerce to satisfy the jurisdictional threshold of § 247(b). Amazing Grace, New Salem, Johnson United, and Mountain View had all purchased religious materials, not simply generic maintenance supplies, electricity, propane, or insurance coverage, from a variety of out-of-state sources [31–1]. This distinction is critical because the purchase, delivery, and dissemination of religious and non-religious literature, religious educational supplies, and prayer materials is precisely the sort of commerce in which churches engage. *See Odom,* 252 F.3d 1289, 1294. Further, all five of the churches defendant burned either regularly hosted out-of-state guests, such as visiting pastors, or held services that were regularly attended by one or more out-of-state members [31–1]. This fact is equally important because at least one federal court has opined that attendance by out-of-state members is sufficient to satisfy the

___

or foreign commerce in interstate or foreign commerce; *and* (2) ... the loss resulting from the defacement, damage, or destruction is more than $10,000." 18 U.S.C. § 247 (1988), *as amended by* The Church Arson Prevention Act § 3(3) (emphasis added).

**3.** The district court instructed the jury, in relevant part: "If you decide that there would be any effect at all on interstate commerce, then that is enough to satisfy this element." *Id.* at 1206 n. 5.

higher jurisdictional threshold of § 844(i). *See United States v. Tush*, 151 F.Supp.2d 1246, 1252 (D.Kan. 2001) ("Very few out-of-state guests may actually attend services at the ... church, but the fact that the church has some out-of-state guests shows that it is actively employed or used in an activity affecting interstate commerce."). Amazing Grace, New Salem, and Johnson United all belonged to an intrastate church organization that contributed financially to the United Methodist Church, a large national organization that spreads charitable and religious services throughout the world [31–1]. Moreover, the New Salem and Johnson United properties were held in trust for the Illinois-based General Conference of the United Methodist Church, from whom Amazing Grace had recently purchased its property outright [31–1]. Johnson United also served as a voting precinct for local and national elections,[4] Amazing Grace commissioned the printing of fund-raising cookbooks by an out-of-state press, and New Salem raised funds in order to send youth groups on trips to Florida and Tennessee [31–1]. Lastly, Mountain View contributed financially to two intrastate organizations that provided medical assistance, food, and housing to American and foreign children intercepted and/or retrieved in interstate commerce, and all five. of the burned churches contributed to the Gideon Bible Ministry, a national organization whose donations help spread Bibles throughout the world [31–1]. This court finds that the stipulated factual basis furnishes a sufficient nexus between each of the burned churches and interstate commerce to satisfy the jurisdictional element of § 247.

## B. Defendant's Facial Challenge to § 247

■ The Constitution confers upon Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States...." U.S. Const. art. I. § 8, cl. 3. Nearly two centuries ago, Chief Justice Marshall opined that "[c]ommerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations...." *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 189–90, 6 L.Ed. 23 (1824). In *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Supreme Court identified three broad categories of activity that Congress may regulate and protect pursuant to its commerce power: (1) "the use of the channels of interstate commerce;" (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities;" and (3) "those activities that substantially affect interstate commerce." *Id.* at 558–59, 115 S.Ct. 1624. *Lopez* and its progeny have focused primarily on the "substantially affect[ing] interstate commerce" prong of the newly delineated analysis. *See e.g., id.; Jones*, 529 U.S. at 856–57, 120 S.Ct. 1904 (2000); *United States v. Morrison*, 529 U.S. 598, 609–10, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000).

For example, the *Lopez* court invalidated the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A), which criminalized the possession of a firearm within 1,000 feet of a school, on grounds that "[t]he possession of a gun in a local school zone is in no sense an economic activity

4. Although the stipulated factual basis does not specifically indicate whether Johnson United ever served as a voting precinct for federal, rather than local, elections [Stip. at 3], defendant does not appear to have contested the government's assertion, in a May 4, 2001 brief, that the church served as a voting precinct for "nationwide elections" [Gov't. Resp. to Def.'s Objections to Mag. R & R to Accept Def.'s Guilty Plea at 10].

that might, through repetition elsewhere, substantially effect any sort of interstate commerce." 514 U.S. at 567, 115 S.Ct. 1624. Likewise, in *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), the Supreme Court ruled that Congress exceeded its authority under the commerce power in enacting the Violence Against Women Act of 1994, 42 U.S.C. § 13981, which provided a federal civil remedy for victims of gender-motivated violence. *See id.* at 619, 120 S.Ct. 1740. The *Morrison* court reasoned: "Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained," *id.* at 610, 120 S.Ct. 1740 (quoting *Lopez,* 514 U.S. at 560, 115 S.Ct. 1624), but "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity." *Id.* at 613, 115 S.Ct. 1624. In both *Lopez* and *Morrison,* the Supreme Court was forced to evaluate the statutes at issue under the "substantially affect[ing] interstate commerce" rationale, because neither statute regulated a channel of interstate commerce, nor did either purport to protect an instrumentality of interstate commerce, or persons or things in interstate commerce. *See Morrison,* 529 U.S. at 609, 120 S.Ct. 1740; *Lopez,* 514 U.S. at 559, 115 S.Ct. 1624.

For the proposition that the Commerce Clause empowers Congress to protect the instrumentalities of interstate commerce even from exclusively intrastate threats, the *Lopez* court cited *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971) (aircraft), *Houston, East & West Texas Railway Company v. United States,* 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914) (railroads), and *Southern Railway Company v. United States,* 222 U.S. 20, 32 S.Ct. 2, 56 L.Ed. 72 (1911) (railway vehicles/boxcars). *See Lopez,* 514 U.S. at 558, 115 S.Ct. 1624. Further, federal courts have sustained Commerce Clause legislation protecting or

regulating instrumentalities such as telephones, *see United States v. Gilbert,* 181 F.3d 152 (1st Cir.1999); automobiles, *see United States v. Cobb,* 144 F.3d 319 (4th Cir.1998); vessels, *see Marchese v. United States,* 126 F.2d 671 (5th Cir.1942); cellular telephone cloning equipment and identification numbers, *see United States v. Clayton,* 108 F.3d 1114 (9th Cir.1997); federally-insured banks, *see United States v. Harris,* 108 F.3d 1107 (9th Cir.1997); interstate roads, *see Alstate Const. Co. v. Durkin,* 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745 (1953); and toll roads and drawbridges connecting interstate roads, *see Overstreet v. North Shore Corp.,* 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656 (1943). Moreover, in *United States v. Bishop,* 66 F.3d 569 (3d Cir.1995), the Third Circuit observed:

> The Supreme Court has made clear that airplanes, railroads, highways, and bridges constitute instrumentalities of interstate commerce which Congress can regulate under the Commerce Clause [citations omitted]. Instrumentalities differ from other objects that affect interstate commerce because they are used as a means of transporting goods and people across state lines. Trains and planes are inherently mobile; highways and bridges, though static, are critical to the movement of automobiles.

*Id.* at 588. This court is not bound by decisions of the Third Circuit, yet its reasoning is persuasive. Given this authority, and looking to the plain meaning of "instrumentality" ("something by which an end is achieved: means ... something that serves as an intermediary or agent through which one or more functions of a controlling force are carried out," Webster's Third New International Dictionary 1172 (1981)), § 247 may fairly be characterized as a statute aimed at protecting the instrumentalities of interstate commerce (churches and synagogues), from both in-

terstate and intrastate threats (arson). *See Lopez,* 514 U.S. at 558, 115 S.Ct. 1624.

■ Congress amended § 247 to expand its Commerce Clause jurisdiction over attacks on places of religious worship "[i]n the face of a virtual national epidemic of arson and other attacks on churches and synagogues." *Grassie,* 237 F.3d at 1209 (citing The Church Arson Prevention Act of 1996, Pub.L. 104–155 (1996)). Congress found churches and synagogues to be involved in interstate commerce in a variety of ways, "including social services, educational and religious activities, the purchase and distribution of goods and services, civil participation, and the collection and distribution of funds for these and other activities across state lines." *Id.* (citing 142 Cong.Rec. S7908–04 at *S7909 (daily ed. July 16, 1996) (Joint Statement of Floor Managers Regarding H.R.3525, The Church Arson Prevention Act of 1996)). Further, the Eleventh Circuit recently observed that although "[c]hurches are not commonly considered a business enterprise ... churches can and do engage in commerce. The 'business' or 'commerce' of a church involves the solicitation and receipt of donations, and the provision of spiritual, social, community, educational (religious or non-religious) and other charitable services." *United States v. Odom,* 252 F.3d 1289, 1291 (11th Cir.2001); *see also Grassie,* 237 F.3d at 1204 ("there was from these church buildings a constant flow of information, money, travel, and purchase and delivery of goods back and forth across state lines."). Finally, the non-profit nature of church "business" is of no consequence; the Supreme Court has declared that the Commerce Clause applies equally to charitable and non-profit entities which "are major participants in interstate markets for goods and services, use of interstate communications and transportation, raising and distributing revenues ... interstate, and so on." *Camps Newfound/Owatonna, Inc. v. Town of Harrison,* 520 U.S. 564, 583–86, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997); *see also Odom,* 252 F.3d 1289, 1291 ("The question of whether a building is used in commerce or affects commerce does not turn merely on whether the activity is engaged in for a profit.").

■ Churches and synagogues may be regarded as "indispensable to the interstate movement of persons and goods," *Bishop,* 66 F.3d at 588, as well as information, money, religious and non-religious literature, and a plethora of social services and civic activities. *See Odom,* 252 F.3d 1289, 1294. Moreover, through such activities, places of worship ultimately serve as "intermediar[ies] or agent[s] through which one or more functions of a controlling force are carried out." Webster's Third New International Dictionary 1172 (1981). Unlike planes, trains, and automobiles, churches and synagogues are not "inherently mobile." *Bishop,* 66 F.3d at 588. And unlike highways and bridges, churches and synagogues are not "critical to the movement of automobiles." *Id.* Yet churches and synagogues are critical to the movement of clergy, congregants, goods, and services across state lines. On its face, therefore, § 247 may be sustained as a valid exercise of Congress' power to protect the instrumentalities of interstate commerce. As such, this court need not address whether the destruction of religious property, the activity regulated by 247, substantially affects interstate commerce. *See, e.g., United States v. Owens,* 159 F.3d 221, 226 (6th Cir.1998), *cert. denied,* 528 U.S. 817, 120 S.Ct. 56, 145 L.Ed.2d 49 (1999) ("Where a statute regulates the 'instrumentalities of interstate commerce,' the law need not address conduct having a substantial effect on interstate commerce in order to survive a constitutional challenge." (citing *Lopez,* 514 U.S. at 558, 115 S.Ct. 1624)).

### C. Defendant's Arson Spree Occurred in Interstate Commerce

Section 247 survives defendant's constitutional attack because the churches at issue in this case, and houses of worship in general, furnish a sufficient connection to interstate commerce to justify protective federal legislation under the Commerce Clause of the United States Constitution. *See* U.S. Const. art. I, § 8, cl. 3. Disregarding the entire prior discussion, however, this case could stand alone on the mere fact that defendant's conduct may in itself be regarded as occurring in or affecting interstate commerce. *See* 18 U.S.C. § 247(b). As Congress explained in 1996, the jurisdictional element of § 247 will be satisfied "where in committing, planning, or preparing to commit the offense, the defendant either travels in interstate . . . commerce, or uses . . . any facility or instrumentality" of interstate commerce. 142 Cong.Rec. S7908–04 at *S7909 (daily ed. July 16, 1996) (Joint Statement of Floor Managers Regarding H.R.3525, The Church Arson Prevention Act of 1996). In the instant case, defendant traveled through Indiana, Kentucky, and Tennessee on his way to Georgia and then back through Kentucky thereafter [31–1]. Defendant utilized interstate highways, gas stations, hotels, and supplies and made various purchases in interstate commerce to prepare for and accomplish a multi-state arson campaign that ultimately targeted eleven churches in four different states [31–1]. Although defendant's crimes in Indiana, Kentucky, and Tennessee are not presently before this court, the stipulated factual basis illustrates that these transactionally-related offenses constitute part of a larger campaign which may fairly be characterized as an "offense . . . in or affect[ing] interstate or foreign commerce." 18 U.S.C. § 247(b). This court is satisfied that on these grounds alone, defendant's § 247 prosecution is constitutionally permissible.

### Conclusion

Having determined that 18 U.S.C. § 247 is a valid exercise of Congress' power to regulate interstate commerce, as applied to the facts of this case and on its face, the court hereby REJECTS defendant's objections to the magistrate judge's report and recommendation of February 21, 2001 and his report and recommendation of April 13, 2001. This court hereby APPROVES and ADOPTS each report and recommendation and directs that this case be scheduled for sentencing on August 17, 2001.